The REPUBLIC OF CHINA, China Merchants Steam Navigation Company, Limited, and The United States of America, Libellants,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, and American International Underwriters, Limited, Respondents.

Nos. 3507, 3508, 3510–3514.

United States District Court
D. Maryland, Admiralty Division.

July 9, 1956.

Ober, Williams, Grimes & Stinson, Baltimore, Md. (William A. Grimes, Baltimore, Md., of counsel), and Kirlin, Campbell & Keating, New York City (Ronald A. Capone, Washington, D. C., of counsel), for libellants, the Republic of China and China Merchants Steam Nav. Co., Limited.

George Cochran Doub, Asst. Atty. Gen. of U. S., Civil Division, Leavenworth Colby, Chief Admiralty Section, Dept. of Justice, Thomas F. McGovern, Atty., Admiralty Sec., Dept. of Justice, Washington, D. C., and Walter E. Black, Jr., U. S. Atty., and James H. Langrall, Asst. U. S. Atty., Baltimore, Md., for libellant, United States.

Lord, Whip & Coughlan, Baltimore, Md. (George W. P. Whip, Baltimore, Md., of counsel), and Bigham, Englar, Jones & Houston, New York City (Vincent L. Leibell, Jr., New York City, of counsel), for respondents.

THOMSEN, Chief Judge.

The libel in each of these seven suits was filed by the Republic of China and China Merchants Steam Navigation Company, Ltd., referred to collectively herein as "Chinese libellants", and by the United States, to recover on policies of marine and war risk insurance issued by respondents. Each policy covered a vessel sold by the United States to the Republic of China during 1946 and 1947, on which the United States received and now holds an hypothecation or preferred ship mortgage to secure deferred payments of the purchase price. The officers and crew of each ship, except the master of the Hai Hsuan, defected to the Chinese Communist regime in January, 1950, in Singapore or Hong Kong, ran up the red flag, and took and kept possession of the ship from Chinese libellants. The efforts made by Chinese libellants and by the United States to recover the vessels have been unsuccessful.

The cases are before the court on respondents' motion for an order under Supreme Court Admiralty Rule 32, 28 U.S.C.A.: (1) dismissing the "libels of the United States"; and/or (2) holding that respondents' separate defense setting up the sue and labor clause be

deemed proved as against the United States; and/or (3) barring the United States from offering evidence in connection with the sue and labor issue at the trial; and/or (4) barring the United States from further prosecution of these suits until it has fully answered eight interrogatories served on it under Rule 31; all because of the alleged failure of the United States to answer said interrogatories fully. At the hearing on the motion the number of interrogatories which respondents claim have not been fully answered was reduced from eight to one, as the result of additional information supplied by the United States.

The interrogatories dealt with the question whether the United States ever requested the British Government to grant a special order in council to permit a suit in the High Court of the Colony of Singapore, involving one of the vessels, to be decided without regard to the sovereign immunity of the Chinese Communist Government. The United States has answered the interrogatories, stating that the request was made orally and in writing, attaching copies or excerpts, satisfactory to respondents, of (a) the written request for an order in council, which would have covered all of the ships, (b) the two letters of instructions from the Secretary of State to the American Embassy in London, (c) the two British replies, and (d) a statement by the British Foreign Office, to be discussed below; but refusing, because it would be "prejudicial to the foreign relations of the United States and contrary to the public interest" to supply any memorandum of conversations between the American and British representatives at the time the requests were made and denied. The determination that such disclosure would be prejudicial to our foreign relations and to the public interest was made by John Foster Dulles, Secretary of State, pursuant to applicable regulations, and is set out in his affidavit filed in this case.

The libel in No. 3507, involving the Hai Hsuan, alleges the sale and hypothecation of that vessel, and the following facts, important on this motion; essentially similar facts are alleged in the other libels.

Respondents insured the Hai Hsuan in the total amount of $550,000 under policies which named the Government of the Republic of China as the assured, for account of whom it may concern, and provided that loss, if any, be payable to the United States Maritime Commission for distribution by it to itself and to the Government of the Republic of China, as their interest may appear, or order. The marine policy insured against loss of the vessel resulting, inter alia, from barratry of the master and mariners. The war risk policies insured against loss of the vessel due, inter alia, to the barratry of the master and mariners, and against loss due to piracy, civil war, revolution, rebellion, or insurrection, or civil strife arising therefrom.

The libel then alleges in detail facts showing the defection of the officers and crew of the Hai Hsuan and the fruitless efforts made by Chinese libellants and the United States to recover possession of the vessel in Singapore. On April 13, 1950, libellants jointly notified respondents of the loss of the vessel Hai Hsuan, abandoned to respondents all their right, title and interest in and to the vessel, and claimed from respondents as a total loss the full amount for which the vessel was insured. On April 28, 1950, respondents notified the Republic of China that they declined to accept abandonment of the vessel.

The libel in the Hai Hsuan case alleges that libellants sued, labored and traveled for, in and about the defense, safeguard and attempted recovery of the vessel; the other libels allege that libellants labored and traveled for those purposes. Each libel claims recovery for expenses so incurred, as well as for the face amount of the policies, with interest.

Respondents' answers deny most of the allegations of the libels and set up as separate and complete defenses: (1) that all the alleged acts of the masters, officers and crews of the respective vessels were done at the request and for the

benefit of and pursuant to instructions, orders and directions from the Chinese Communist Government, which at all material times was engaged in civil war and was the de facto government of China, except Formosa, and which, from midnight of January 5/6, 1950, was recognized by the British Government as the de jure government of the Republic of China; that the claim is excluded from the marine coverage on hull and increased value by the F. C. & S. (Free of Capture and Seizure) warranty thereon, which excluded, inter alia, coverage from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom; (2) that any such claim was excluded from the war risk coverage by the clause "excluding capture and seizure"; (3) that libellants failed to exercise due diligence or make reasonable efforts for the recovery of the vessel, as required by the sue and labor clause in said policies.

Other papers admitted in evidence for the decision of this motion show the following facts. The British Government recognized the Chinese Communist Government at midnight on January 5/6, 1950, despite the opposition of the United States Government. On January 16, 1950, the six ships other than the Hai Hsuan were in Hong Kong; the masters and the crews defected and ran up the Chinese Communist flag. On January 17 declarations of default under the hypothecations and mortgages were made by the United States Maritime Commission and the other agencies involved; notice of those declarations was served on the Republic of China, with a demand for payment of the entire mortgage debt; and American officials at various Far Eastern ports were instructed to make representations to local authorities to prevent the vessels from sailing until legal action could be commenced. On or about January 24 the officers and crew of the Hai Hsuan defected and ran up the red flag in Singapore. On January 31 the American Consul General in Hong Kong received an opinion from solicitors whom he had consulted that a suit to re-cover the ships would be unsuccessful unless the Chinese Communist Government would waive its immunity to suit in the Hong Kong court. This opinion was confirmed by a decision of the Chief Judge of the Supreme Court of Hong Kong, Civil Air Transport, Inc. v. Chennault, Willauer & Wang, et al., 34 Hong Kong Law Reports 358, affirmed by the full court, exercising appellate jurisdiction, on May 13, 1950, 34 Hong Kong Law Reports 386, and by the decision in Singapore referred to in the next paragraph.

The United States filed a proceeding in the High Court of the Colony of Singapore against the acting captain and third officer, respectively, of the Hai Hsuan to recover possession of that ship. The defendants therein moved to have the writ and all subsequent proceedings set aside on the ground that the vessel was the property of the Chinese Communist Government, a foreign sovereign state recognized by the British Government, and that the court had no jurisdiction to entertain the suit. Following The Cristina, (1938) A.C. 485, the Chief Justice of the High Court found that the Central People's Government of the People's Republic of China (the Communist Government) is recognized both de facto and de jure as the only government of China by the British Government, and held that if the proceedings were successful they would have the effect of depriving the present government of China of possession. Accordingly, on March 28, 1950, he set aside the writ. The Hai Hsuan, United States v. Yang Soon Ee and another, 1 Malayan Law Report 63 (1950).

On February 7, 1950, the Secretary of State instructed the American Charge d'Affaires ad interim, in London, to make representations to the British Government to the end that the British Government not place unnecessary obstacles in the path of the United States to prompt recovery of the vessels. The American Government requested an order in council declaring that it should not be a bar to the jurisdiction of the Singapore or Hong Kong courts that an action involv-

ing these ships, filed or to be filed therein, would in effect implead a foreign sovereign state. Such a special order in council was issued on May 10, 1950, in connection with the seventy aircraft involved in the C. A. T. case, and a few days later C. A. T. instituted new proceedings in the Supreme Court of Hong Kong, which, although lost in Hong Kong, resulted in a decision in its favor by the Privy Council, Civil Air Transport, Inc. v. Central Air Transport Corp., (1953) A.C. 70, (1952) 2 Lloyd's Reports 259.

On August 17, 1950, the British Government refused to issue an order in council with respect to the vessels in Hong Kong. On September 2, the Department of State instructed the American Embassy in London to make a formal written request for an order in council permitting suit in the Hong Kong and Singapore courts. The formal written request was presented on September 12, 1950, and was formally denied on November 24, 1950. Meanwhile the British permitted the six vessels then in Hong Kong to sail to Canton during the latter part of September, 1950. This matter was freely discussed in the United States Senate on December 1, 1950. 96 Cong. Rec. 16,011.

All these documents have been made available to respondents, together with all the records dealing with these ships in the Department of Justice, the Department of the Army, the Department of the Navy, the Maritime Commission, the Department of Commerce, Maritime Administration, the Export Import Bank, and consular offices at Hong Kong and Singapore. Additional material is being assembled by the Government for examination by respondents, pursuant to rulings by the court at the hearing on this and other motions, and pursuant to demands voluntarily complied with by the Government.

■ The only interrogatory not fully answered by the Government asks for the author, date and custody of any memorandum or memoranda pertaining to the oral request for an order in council. The documents already filed show that this oral request was made pursuant to written instructions from the State Department, and was followed some time later by the formal written request. The written request, the two letters of instructions from the State Department to the Embassy, and the two British replies have all been made available to respondents. The interrogatory in question is evidently preliminary to a motion under Admiralty Rule 32 for the production of the memorandum or memoranda. That rule, like Civil Rule 34, 28 U.S.C.A., requires an applicant to show good cause for the production of the documents desired, and "show that they are not privileged and are material to the matter involved". United States v. 5 Cases, etc., D.C.Conn., 9 F.R.D. 81, at page 83, Hincks, J., affirmed 2 Cir., 179 F.2d 519; Hickman v. Taylor, 329 U.S. 495, 508, 67 S.Ct. 385, 91 L.Ed. 451.

Respondents hope to find in the memorandum or memoranda some notation or statement by a foreign service officer which can be offered in evidence against the United States as an admission against interest, or some evidence that the United States did not use its "utmost endeavor" to secure an order in council. Quaere: Do respondents mean legal, political or military endeavor?

■■ It is doubtful whether the information sought by respondents would be competent evidence against the United States in these cases. Foreign service officers may make official representations only "as directed by the Department". Foreign Service Manual, Vol. 4 (Political Affairs), sec. 031.2(b); Story on Agency, sec. 307a; Whiteside v. United States, 93 U.S. 247, 257, 23 L.Ed. 882; Hawkins v. United States, 96 U.S. 689, 691, 24 L.Ed. 607. But it is not necessary to decide that question at this time. Interrogatories are not limited to evidence which would be admissible at the trial. Foundry Equipment Co. v. Carl-Mayer Corp., D.C., 11 F.R.D. 108, 109; Hornung v. Eastern Auto Forwarding Co., D.C., 11 F.R.D. 300, 301.

Nor is it necessary to decide at this time whether the sue and labor clause is permissive. or imperative, and whether there is any duty on a loss payee, not a named insured, to sue and labor, and the nature and extent of any such obligation. Those questions must await the full hearing on the merits.

 It is, of course, generally true that the United States, like any other litigant, is subject to the Federal Rules of Civil Procedure, and may not refuse "to make the same sort of disclosure of its case as would be required of an individual plaintiff". United States v. General Motors Corp., D.C.N.D.Ill., 2 F.R.D. 528, 530. See also Bowles v. Ackerman, D.C.S.D.N.Y., 4 F.R.D. 260, 262; Hickman v. Taylor, 329 U.S. 495, 507, 67 S. Ct. 385, 91 L.Ed. 451. The Government has made such disclosure in this case. Respondent insurance companies have already had full discovery of all commercial-type information in the Government's files. They seek also political information of activities which affect the foreign relations and public interest of the people of the United States. When respondents issued their insurance policies they knew, or should have known, that where military secrets and similar matters are at stake, certain information is privileged. "In each case, the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake. *A fortiori*, where necessity is dubious, a formal claim of privilege * * * will have to prevail." United States v. Reynolds, 345 U.S. 1, 11, 73 S. Ct. 528, 533, 97 L.Ed. 727.

 In the case at bar the only reason for the refusal of the United States to supply the information requested is the determination by the Secretary of State that its disclosure "would be prejudicial to the foreign relations of the United States and contrary to the public interest". In view of the differences of opinion between the American and British Governments over the British recognition of Communist China and the many problems arising therefrom, that determination appears to be clearly justified. See discussion in the United States Senate referred to above; discussion in House of Commons on May 24, 1950, Vol. 475, Parliamentary Debates, col. 2070, 2084; and Fitzsimons, The Foreign Policy of the British Labour Government, 1945–1951, University of Notre Dame Press, pp. 133, et seq.

Respondents themselves are claiming a privilege, different in character but similar in effect, in refusing to disclose what their London solicitors, Messrs. Constant and Constant, learned from the British Foreign Office. Some of the information requested by the interrogatories could not be supplied by the United States unless and until the British Government waived its privilege in connection therewith. 4 Moore, Int'l Law Digest (1906), pp. 717, et seq., Intercourse of States, Official Correspondence, sec. 684, Publication of Correspondence. That waiver was finally obtained and respondents were furnished with the papers. In the meantime proctors for the United States had suggested to proctors for respondents that their clients, who have offices in London, might be able to obtain the desired information directly from the British Foreign Office. Respondents engaged Messrs. Constant and Constant, a firm of solicitors in London, to obtain this information, and Her Majesty's Principal Secretary of State for Foreign Affairs advised the United States Ambassador on December 13, 1954, that information had been supplied to Messrs. Constant and Constant. The solicitors reported what they learned to respondents and their proctors, and the United States has moved the court to require respondents to disclose the information so obtained. Respondents oppose the motion on the ground that communications from counsel to client are priv-

'ileged. I doubt whether this information comes within the privilege. But I have sustained respondents' continued objection to its disclosure, after telling them that I will infer from their objection that the evidence suppressed would be contrary to their argument, i. e., that the information furnished by the Foreign Office to Constant and Constant would support the contention made by the United States, that the information which respondents seek to obtain by means of the interrogatory in question is immaterial. Mammoth Oil Co. v. United States, 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137; The Algie, D.C.E.D.N.Y., 56 F.2d 388; Baltic Cotton Co. v. United States, D.C.S.D. Ala., 50 F.2d 257.

As the Reynolds case points out, there is a clear distinction between criminal cases prosecuted by the United States and civil cases, such as this. Here, as in the Reynolds case, the necessity for the disclosure of the information requested is dubious, and the reason for sustaining the claim of privilege is clear.

The question before the court is whether the refusal of the United States to supply the information requested in the one interrogatory which has not been fully answered should bar its recovery under the insurance policies in suit. It would be most unjust to give it that effect, in view of the reason for its refusal, the other information supplied by the United States, and the other sources of information available to respondents. Interrogatories "are not to be used as a device or a stratagem to maneuver the adverse party into an unfavorable tactical position. To do so is to pervert a remedy designed to advance the disposition of controversies on their merits, into a weapon to revive what has been aptly denominated as 'the sporting theory of justice'—the very shortcoming of the old procedure that the new rules were designed to cure." Aktiebolaget Vargos v. Clark, D.C.D.C., 8 F.R.D. 635, 636, Holtzoff, J.

Respondents' motion (Paper No. 92) is hereby denied.