**CARL ZEISS STIFTUNG, etc., et al.,
Plaintiffs,**

v.

**V. E. B. CARL ZEISS, JENA, et al.,
Defendants.**

Misc. No. 22–65.

United States District Court
District of Columbia.
May 18, 1966.

John W. Douglas, Asst. Atty. Gen., David G. Bress, U. S. Atty., Harland F. Leathers and William P. Arnold, Attys., Dept. of Justice, for Nicholas deB. Katzenbach, U. S. Atty. Gen.

Harry I. Rand, Washington, D. C., and Warren F. Schwartz and Weisman, Allan, Spett & Sheinberg, New York City, for

defendants, V. E. B. Carl Zeiss, Jena, Steelmaster, Inc., and Ercona Corp.

## OPINION

ROBINSON, District Judge.

The Government has moved for additional modification of a subpoena commanding the production of documents, from files in the Department of Justice, for discovery incidental to a civil case pending in the District Court for the Southern District of New York,[1] to which the Government is not a party. The motion proposes the elimination from the production requirement of documents as to which a claim of executive privilege is made, and the modification of an order directing submission for *in camera* inspection of documents as to which the Government asserts a privilege.[2]

The New York action was brought by two West German entities, Carl Zeiss Stiftung (Stiftung) and Zeiss Ikon A. G. (Ikon), against an East German enterprise, V. E. B. Carl Zeiss, Jena (Zeiss Jena), and four of its American representatives, among whom are Ercona Corporation (Ercona) and Steelmasters, Inc. (Steelmasters),[3] to resolve questions stemming from a contest as to the ownership of the internationally famous "Zeiss" trademarks and trade names and exclusive right to use them in the United States.[4] In an earlier suit brought in this Court by Ercona and Steelmasters against the Attorney General and other Government officials, it had been held that the Attorney General was not vested with ownership of the trademarks in consequence of transactions emanating from purported wartime seizures.[5] Claims pressed by the plaintiffs in the pending action are resisted on the basis of findings made in the older proceeding which, it is asserted, they are precluded by principles of estoppel and laches from relitigating; and it is in an effort to support these contentions that Zeiss Jena, Steelmasters and Ercona (the claimants) obtained the subpoena in question.

Since the plaintiffs were not parties to the first case, the estoppel is predicated upon the contention that they cooperated and participated in the Government's activities therein. The laches defense is rested upon allegations that the plaintiffs were aware of adverse uses

1. See Stiftung v. V. E. B. Carl Zeiss, Jena, 32 F.R.D. 608 (S.D.N.Y.1963).

2. The subpoena, obtained by certain defendants in the New York litigation pursuant to F.R.Civ.P. 45(d) (1), directs the production of numerous documents. On the Government's motion to quash, this Court, in an unpublished opinion, held that relevance and good cause had been shown to a degree sufficient to require production of nonprivileged materials, but that the scope of the subpoena should be narrowed to reduce the Government's burden of compliance. It was further held that action on the Government's assertion of attorney-client privilege and attorney's work-product should be deferred until such claims were directed toward specific items submitted for in camera inspection. The order effected modifications of the subpoena accordingly, and preserved the Government's right to apply for further modification on grounds of privilege.

3. Stiftung and Ikon are organizations located in West Germany. Zeiss Jena is alleged to be a Volkseigener Betrieb, or "People-Owned Enterprise," organized in the Soviet Zone of Germany. Steelmasters is an Illinois corporation and Ercona, formerly Ercona Camera Corporation, is a New York corporation. The plaintiffs and the two other defendants have not participated in this aspect of the litigation.

The historical and commercial relationships of the various Zeiss organizations are discussed in Rogers v. Ercona Camera Corp., 107 U.S.App.D.C. 295, 277 F.2d 94 (1960) and Stiftung v. V. E. B. Carl Zeiss, Jena, supra note 1.

4. The plaintiffs seek a declaratory judgment, injunctive relief and damages on allegations of trademark infringement and related claims of unfair competition and misrepresentation of goods.

5. Ercona Camera Corp. v. Brownell, Civil Action No. 1402–56 (D.D.C.), aff'd sub nom. Rogers v. Ercona Camera Corp., supra note 3.

of the trademarks but nonetheless failed to assert their claims in the earlier suit. The subpoena embraces documents bearing on the nature and extent of the relationship between the plaintiffs and the Government prior to and during the period the Government was involved in the litigation.

Additionally, the complaint in the New York action alleges that Stiftung, and not Zeiss Jena, has been recognized by the United States as the only producer of genuine Zeiss goods. In support of this position, it points to a sale by the Government to a Stiftung subsidiary of the capital stock of Carl Zeiss, Inc. (Zeiss New York),[6] a New York distributor of Zeiss products, and alleges that the Government refused to negotiate with Ercona, or to offer the stock for sale at public auction, because of a determination by the Attorney General that sale to the Stiftung affiliate was in the public interest. To enable discovery with a view to challenging these claims, the subpoena also includes documents relating to the sale transaction for such light as they may shed on the then relationship between the Government and the plaintiffs.

The Government has already produced an assortment of approximately 4,500 documents pertaining to a variety of activities and events. These comprise all but 49 of the documents the subpoena requires, and as to these a claim of executive privilege is asserted and supported by an affidavit made by the Attorney General. The affidavit states that the documents withheld consist in intra-departmental memoranda and inter-departmental communications containing opinions, recommendations and deliberations pertaining to decisions the Department was required to make as to litigation and other matters, and recites the Attorney General's conclusion, following personal examination, that their production would be contrary to the public interest.

■ The Government's present motion is hotly contested, but implicit in the claimants' position is the realization that production must be restricted to materials "not privileged."[7] All parties recognize, too, that privilege for this purpose exists or not according to common acceptations in the law of evidence.[8] Immunity from production based on privilege is neither broader nor narrower than it would be in the normal trial context.[9]

In advocating its contentions, the Government has alluded to traditional limitations on judicial authority inherent in the doctrine of separation of powers, and has pointed out that the documents sought grew out of its internal operations. In the view the Court takes of the matter, however, there is no occasion for investigation into the constitutional dimensions of executive privilege,[10] or the scope of protection derived solely from the intra-governmental character

---

6. Seized in 1942 by the Alien Property Custodian, the Attorney General's predecessor. See Rogers v. Ercona Camera Corp., supra note 3.

7. Since the instant subpoena was issued pursuant to F.R.Civ.P. 45(d) (1), it could require production only of materials "which constitute or contain evidence relating to any of the matters within the scope of the examination permitted by Rule 26(b)" which, in turn, restricts examination to matters "not privileged." See Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 110, 280 F.2d 654, 658 (1960); Machin v. Zuckert, 114 U.S. App.D.C. 335, 337 n. 2, 316 F.2d 336, 338

n. 2 (1963), cert. denied 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963). Compare United States v. Reynolds, 345 U.S. 1, 6, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

8. Wild v. Payson, 7 F.R.D. 495, 499 (S.D. N.Y.1946). Compare United States v. Reynolds, supra note 7, 345 U.S. at 6, 73 S.Ct. 528.

9. Transmirra Products Corp. v. Monsanto Chemical Co., 26 F.R.D. 572, 576 (S.D. N.Y.1960); 4 Moore, Federal Practice ¶ 26.22 at 1281 (1963 repr.).

10. See United States v. Reynolds, supra note 7, 345 U.S. at 6, 73 S.Ct. 528.

of the materials withheld.[11] What is decided, and all that needs to be decided, is that, as documents integral to an appropriate exercise of the executive's decisional and policy-making functions, they are immune from the disclosure the claimants seek.

## I

"Executive privilege is a phrase of release from requirements common to private citizens or organizations"[12] — an exemption essential to discharge of highly important executive responsibilities. While it is agreed that the privilege extends to all military[13] and diplomatic[14] secrets, its recognition is not confined to data qualifying as such. Whatever its boundaries as to other types of claims not involving state secrets, it is well established that the privilege obtains with respect to intra-governmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.[15]

This privilege, as do all evidentiary privileges, effects an adjustment between important but competing interests. There is, on the one hand, the public concern in revelations facilitating the just resolution of legal disputes, and, on the other, occasional but compelling public needs for confidentiality. In striking the balance in favor of nondisclosure of intra-governmental advisory and deliberative communications, the privilege subserves a preponderating policy of frank expression and discussion among those upon whom rests the responsibility for making the determinations that enable government to operate,[16] and thus achieves an objective akin

11. See, e. g., Universal Airline v. Eastern Air Lines, 88 U.S.App.D.C. 219, 226, 188 F.2d 993, 1000 (1951); Gardner v. Anderson, 9 Fed.Cas. p. 1158, No. 5220 (C.C.D. Md.1876).

12. Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 944, 141 Ct.Cl. 38 (1958).

13. United States v. Reynolds, supra note 7; Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875).

14. Republic of China v. National Union Fire Insurance Co., 142 F.Supp. 551 (D. Md.1956); United States v. Burr, 25 Fed. Cas. p. 30, No. 14692d (C.C.D.Va.1807).

15. Machin v. Zuckert, supra note 7, 114 U.S.App.D.C. at 338, 316 F.2d at 339 (deliberations and recommendations as to Air Force policy); Boeing Airplane Co. v. Coggeshall, supra note 7, 108 U.S. App.D.C. at 112, 280 F.2d at 660 (recommendations as to Renegotiation Board policies and decisions); Clark v. Pearson, 238 F.Supp. 495, 496 (D.D.C.1965) (advisory recommendations as to Justice Department action); Zacher v. United States, 227 F.2d 219, 226 (8th Cir. 1955), cert. denied 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 858 (1956) (recommendations to Attorney General as to litigation decision); Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, (opinions as to proposed sale of plants by General Services Administration); Walled Lake Door Co. v. United States, 31 F.R.D. 258, 259–260 (E.D.Mich.1962) (memoranda and reports pertaining to decision of Interstate Commerce Commission); E. W. Bliss Co. v. United States, 203 F.Supp. 175, 176 (N.D.Ohio 1961) (transmittal letters); O'Keefe v. Boeing Co., 38 F.R.D. 329, 334 (S.D.N.Y.1965) (opinions, recommendations and deliberations as to Air Force policy). See also North American Airlines v. Civil Aeronautics Board, 100 U.S.App.D.C. 5, 12, 240 F.2d 867, 874 (1956), cert. denied 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957) (recommendations to Board).

No claim of diplomatic secrets is presented either in the Attorney General's affidavit or in the Government's written or oral argument. The affidavit states that inter-departmental communications "often contain information or reflect views affecting policy considerations at the highest executive levels, including positions involving the foreign policy of the United States," but as the claimants point out, it does not state that the particular documents withheld have any such content. Any ambiguity in this regard is dispelled by the Government's express disclaimer in its brief that they involve any military or state secrets.

16. "Free and open comments on the advantages and disadvantages of a proposed course of governmental management

to those attained by other privileges more ancient and commonplace in character.[17] Nowhere is the public interest more vitally involved than in the fidelity of the sovereign's decision- and policy-making resources.[18]

The Attorney General is charged with the duty of rendering all legal services essential to the operations of the Executive Branch.[19] He also carries the burden of litigation to which the United States or any of its agencies is a party.[20] These responsibilities are discharged through the Department of Justice, and the Department's legal business embraces the requirements and activities of various governmental agencies. It is evident that the Department, to function adequately, must depend heavily upon candid exchanges of ideas, not only among its own staff but also, particularly because of the institutional nature of its decisions, with other agencies whose interests are involved.

To the extent that such communications may later be scrutinized by others, the communicative process itself becomes embarrassed. Without adequate assurance against disclosure, clients would tell lawyers considerably less than they do; unless the lawyer's thoughts were inviolate, "much of what is now put down in writing would remain unwritten." [21] Freedom of communication vital to fulfillment of the aims of wholesome relationships is obtained only by removing the specter of compelled disclosure. And while no clear separation can be made between the United States as a client-litigant and the Department as its legal representative, government, no less than the citizen, needs open but protected channels for the kind of plain talk that is essential to the quality of its functioning.

As important as are these considerations, the cases, analyzed critically, demonstrate that the immunity of intra-governmental opinions and deliberations also rests upon another policy of equal vitality and scope. The judiciary, the courts declare, is not authorized "to probe the mental processes" of an executive or administrative officer.[22] This salutary rule forecloses investigation into the methods by which a decision is reached,[23] the matters considered,[24] the

---

would be adversely affected if the civil servant or executive assistant were compelled by publicity to bear the blame for errors or bad judgment properly chargeable to the responsible individual with power to decide and act. Government from its nature has necessarily been granted a certain freedom from control beyond that given the citizen. * * * There is a public policy involved in this claim of privilege for this advisory opinion—the policy of open, frank discussion between subordinate and chief concerning administrative action." Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 945–946.

17. Essentially similar policies of uninhibited communication underlie such frequently used common law privileges as those subserving the attorney-client and husband-wife relationships. See 8 Wigmore, Evidence, §§ 2291, 2332 (McNaughton rev. 1961).

18. "Government, operating as it does through a hierarchy of agents, must have the benefit of their full, free advices." United States v. Proctor & Gamble Co., 25 F.R.D. 485, 489 (D.N.J.1960).

19. 5 U.S.C. §§ 291, 306.

20. 28 U.S.C. § 507(b); Exec. Order No. 6166, § 5 (1933), reprinted at 5 U.S.C. 157, 159 (1964).

21. Hickman v. Taylor, 329 U.S. 495, 511, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947).

22. Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 999, 82 L.Ed. 1129 (1938). See also the cases cited infra notes 23 to 26.

23. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); DeCambra v. Rogers, 189 U.S. 119, 122, 23 S.Ct. 519, 47 L.Ed. 734 (1903); Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 946–947.

24. See Fayerweather v. Ritch, 195 U.S. 276, 306–307, 25 S.Ct. 58, 49 L.Ed. 193 (1904); DeCambra v. Rogers, supra note 23, 189 U.S. at 122, 23 S.Ct. 519.

contributing influences,[25] or the role played by the work of others [26]—results demanded by exigencies of the most imperative character. No judge could tolerate an inquisition into the elements comprising his decision [27]—indeed, "[s]uch an examination of a judge would be destructive of judicial responsibility" [28]—and by the same token "the integrity of the administrative process must be equally respected." [29] Identically potent reasons dictate that protection no less extensive be afforded the processes by which the Attorney General's responsibilities for decisional and policy formulations, legal or otherwise, are discharged.[30]

█ Inextricably intertwined, both in purpose and objective, are these two principles. The rule immunizing intra-governmental advice safeguards free expression by eliminating the possibility of outside examination as an inhibiting fac-tor, but expressions assisting the reaching of a decision are part of the decision-making process.[31] Similarly, the so-called "mental process rule" impresses the stamp of secrecy more directly upon the decision than upon the advice, but it extends to all phases of the decision-making process, of which the advice is a part.[32] Each rule complements the other, and in combination they operate to preserve the integrity of the deliberative process itself. It is evident that to demand pre-decision data is at once to probe and imperil that process.

█ Such is the nature of the Government's claim of privilege, formally asserted in its behalf by the Attorney General, whose affidavit not only so defines the documents retained as to bring them well within the scope of the privilege, but also incorporates his assessment, upon personal consideration, of the consequences of their production. With the privilege thus properly invoked,[33] and

25. Chicago, B. & Q. Ry. Co. v. Babcock, 204 U.S. 585, 593, 27 S.Ct. 326, 51 L.Ed. 636 (1907) ; West v. Hitchcock, 205 U.S. 80, 86, 27 S.Ct. 423, 51 L.Ed. 718 (1907) ; Union Savings Bank of Patchogue v. Saxon, 209 F.Supp. 319 (D.D.C.1962) ; Continental Distilling Corp. v. Humphrey, 17 F.R.D. 237, 241 (D.D.C.1955) ; National Labor Relations Board v. Air Associates, Inc., 121 F.2d 586, 588–589 (2d Cir. 1941).

26. United States v. Morgan, supra note 23, 313 U.S. at 422, 61 S.Ct. 999; Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 946–947. See also Norris & Hirshberg, Inc. v. Securities & Exchange Comm'n, 82 U.S.App.D.C. 32, 36, 163 F.2d 689, 691 (1947).

27. See United States v. Morgan, supra note ·23, 313 U.S. at 422, 61 S.Ct. 999; Fayerweather v. Ritch, supra note 24, 195 U.S. at 306–307, 25 S.Ct. 58.

28. United States v. Morgan, supra note 23, 313 U.S. at 422, 61 S.Ct. at 1004.

29. Ibid.

30: In his affidavit, the Attorney General states: "Clearly, if this Department is to receive frank legal and policy recommendations and suggestions from its profes-sional staff and from other departments of the executive branch of the Government, such communications must be immune from public disclosure. Any impairment of the free flow of recommendations and suggestions would be a grave injury to the Government and would adversely affect the administration of justice and the public interest."

31. No logical or legal distinction can be drawn between decision- and policy-making processes. Establishment of policy involves decision, and a decision naturally reflects some policy. By the same token, no legally significant difference can be made between the Attorney General's decisions as to the Government's litigation position in the Ercona case and his decision as to the sale of the stock of Zeiss New York, each of which obviously involved an exercise of the deliberative process.

32. See the cases cited supra notes 23 to 26.

33. The formal prerequisites for assertion of executive privilege are specified in United States v. Reynolds, supra note 7, as follows: "The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of

the generally meritorious character of the claim apparent from the affidavit, the question remaining is whether, in the circumstances of the case, it should now be honored.

## II

To restate the Government's claim and its justifications is not to say that non-disclosure is to follow in all instances where the conditions prerequisite to invoking the privilege are found to exist. Nor is it to suggest that the interests it protects cannot be outweighed in particular situations by a sufficiently strong showing of necessity for examination. The exigencies of this case do not require holdings so broad. Accepting here the teaching of some of the decisions that the privilege is qualified,[34] and by weighing the detrimental effects of disclosure against the necessity for production shown, the claimants' demonstration is anemic to the point that no delineation of the outer limits of the privilege is called for.

■ The starting point is the Attorney General's affidavit describing the general character of the documents in dispute and expressing his view as to the harm consequent upon their exposure. Without impinging upon judicial responsibility in the slightest degree [35] the Court can and should weigh, in the gravest manner possible, his considered judgment as to the impact of the production sought upon the public interest.[36] And examination of the factual contents of the affidavit serves further to illumine the decisional course to be taken.

Approximately 4,500 documents have already been furnished the claimants; those which have not been total only 49. While the issue at bar is not to be resolved by numbers alone, the sharp contrast between the data that have been produced and those that have not is quite revealing. The claimants have had access to all of the Government's communications with outsiders, as well as to nearly all intra-governmental materials, and the items withheld are all internal papers. Thus there could remain no unseen document primarily attesting the Government's relations with third persons. More importantly, what are retained are intra-departmental memoranda and inter-departmental communications composed wholly of opinions, recommendations and deliberations relating to legal and other determinations.[37] There is an obvious distinction, in terms of necessity for inspection, between documents of this character and those which contain facts.[38]

While examination of the contested papers is not to be denied simply because they are secondary rather than primary sources, the size and diversification of the production already made raises great doubt as to what additional informational tendencies they could have. The only hint in that direction is furnished by the

privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." (345 U.S. at 7–8, 73 S.Ct. at 532). While Reynolds involved military secrets, subsequent decisions have uniformly applied the guidelines it expressed irrespective of the particular kind of executive claim advanced. See the cases cited supra note 15.

34. See e. g., Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 946; Timken Roller Bearing Co. v. United States, 38 F.R.D. 57, 64 (N.D.Ohio 1964).

35. See United States v. Reynolds, supra note 7, 345 U.S. at 8, 9–10, 73 S.Ct. 528.

36. Capitol Vending Co. v. Baker, 35 F.R.D. 510 (D.D.C.1964); Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 944; Pollen v. Ford Instrument Co., 26 F.Supp. 583, 585 (E.D.N.Y.1939).

37. That the memoranda and communications withheld contain nothing else was plainly indicated in the Attorney General's affidavit. Any possible question in this regard is put to rest by Government counsel's representation to that effect during oral argument. See Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 944.

38. See O'Keefe v. Boeing Co., supra note 15, 38 F.R.D. at 336.

claimants' argument that the materials furnished contain references to materials which the Government has not yet brought forward. But any inference that what the Government retains are the documents so referred to is far too tenuous to meet the standard of necessity for disclosure. The Attorney General's affidavit states that a full response to the subpoena has been made save for the 49 items. It does not appear that these items have any other character than that stated in the affidavit, and with the content there described, they could not be those to which reference is made. It would also seem highly improbable that the Government would have in the past divulged to outsiders the existence of the very materials the secrecy of which it now so vigorously seeks to protect. If there are documents to which the references that concern the claimants can relate, the far more likely explanation is that they are obtainable only elsewhere, if at all.

■ The claimants' presentation is also devoid of a showing that the papers already furnished have not supplied the great bulk of the information for which the claimants earlier professed a need. Nothing appears that would make illogical the assumption that, the number and diversification of these documents considered, fresh non-governmental sources of information were indicated by exploration of which, through deposition or otherwise, additional information could be developed. There is nothing beyond sheer speculation to even hint that the information the retained communications drew upon as the basis for the opinions and recommendations expressed does not appear or is not discoverable from the mass of data the claimants now possess. Necessity for production is sharply reduced where an available alternative for

obtaining the desired evidence has not been explored.[39]

■ At stake in this litigation are not only those governmental processes by which the Nation's legal affairs receive attention in privacy, but also, as the Attorney General's affidavit makes plain, those by which its high level policies are confidentially considered and determined. The plaintiffs in the New York action allege, and the claimants deny, that the Government's decision and activities respecting the sale of the stock of Zeiss New York were dictated by a consistent policy of recognizing the Federal Republic of Germany as the only lawful German government and refusing to recognize the existence of a state in the Soviet Zone. Notwithstanding that this controversy generates, as a prime reason, the claimants' demand for access to the documents retained, and assuming even that they reflect information bearing on the issue, a license to probe the Government's nonpublic files on so delicate a matter is not to be lightly conferred.[40] Despite the Government's disavowal of the involvement of diplomatic secrets,[41] enough danger is indicated from what appears to inveigh seriously upon the production call.

■ The basic fallacy in the claimants' approach results from the fact that they endeavor to exploit what they consider to be weaknesses in the Government's case without making any real case of their own. At best, the only position they can sustain is that, notwithstanding the strong showing made by the Government, there remains a speculative possibility that something to which they may legitimately be entitled is withheld. It is not, however, incumbent upon the Government to negative all the possible uses production of the retained documents might serve; the requirement is that the claimants make a showing of necessity

39. United States v. Reynolds, supra note 7, 345 U.S. at 11, 73 S.Ct. 528.

40. See Republic of China v. National Union Fire Insurance Co., supra note 14.

41. See supra note 15.

sufficient to outweigh the adverse effects the production would engender.[42]  Here the Government has not only established the conditions that make proper the presentation of a claim of privilege, but has also demonstrated in a highly convincing manner that further disclosures would only result in an invasion of important interests, causing dire public consequences without any apparent discovery benefit to the claimants.

■ Indeed, the claimants renounce any interest in examining the documents in dispute for possible leads to admissible evidence.  They unequivocally represent, on the contrary, that what they seek for evidentiary use are the documents themselves—as elements of the deliberative process by which the Government's litigation course in the earlier case evolved and its decision on the stock sale was reached.[43]  Such a use would clearly violate the established rule, previously discussed,[44] forbidding investigation into the processes by which decisions and policies are formulated.  Although more usu-

ally applied in cases where an effort is made to challenge the determination itself, the proscription obtains with equal force where the decision is to be used only as a link in an evidentiary chain.[45]  "[T]he cerebrations and mental processes of government officials, leading to admittedly proper exercises of power, can never be a factor in a judicial proceeding and, therefore, need not be disclosed." [46]

■ Here, unlike the situation in some cases, no charge of governmental misconduct [47] or perversion of governmental power [48] is advanced.  Since the Government is not a party to the New York action, no problem of an unfair litigating advantage is presented.[49]  All that is involved is a collision between what the claimants feel they need to see and what the Government conceives it must defend from outside scrutiny.  Upon a consideration of all of the circumstances, it is clear that the interests the privilege is designed to protect greatly outweigh any need for production the claimants are able to advance.

42. See United States v. Reynolds, supra note 7, 345 U.S. at 10–11, 73 S.Ct. 528; Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 946–947.

43. The claimants, in their brief, say: "In the present case, * * * it is the manner in which the Justice Department made the litigation decisions in the Ercona case and the nature of the decision it made to sell the stock of Carl Zeiss, Inc. to the West German Zeiss firms which themselves are the ultimate facts in issue and as to which discovery is requested. In other words, the facts concerning the deliberations and communications are not sought in order to develop other underlying facts, but because the nature and extent of the deliberations and communications are themselves directly relevant."

44. See cases cited supra notes 22 to 29 and related text.

45. Fayerweather v. Ritch, supra note 24; DeCambra v. Rogers, supra note 23; Kaiser Aluminum & Chemical Corp. v. United States, supra note 12.
   Additionally, the order authorizing the sale of the stock of Zeiss New York de-

lineates the reasons for the selection of the vendee thereof.  This document, the Court understands, is available to the claimants.

46. Rosee v. Board of Trade, 36 F.R.D. 684, 689 (N.D.Ill.1965).  See also Totten v. United States, supra note 13.

47. Singer Sewing Machine Co. v. National Labor Relations Board, 329 F.2d 200, 208 (4th Cir. 1964); Rosee v. Board of Trade, supra note 46; Bank of Dearborn v. Saxon, 244 F.Supp. 394 (E.D.Mich. 1965).

48. See United States v. Proctor & Gamble Co., supra note 18.

49. See United States v. Reynolds, supra note 7, 345 U.S. at 12, 73 S.Ct. 528; Olson Rug Co. v. National Labor Relations Board, 291 F.2d 655 (7th Cir. 1961); Timken Roller Bearing Co. v. United States, supra note 34; United States v. San Antonio Portland Cement Co., 33 F.R.D. 513 (W.D.Tex.1963).  See also Machin v. Zuckert, supra note 7, 114 U.S.App.D.C. 335, 338, 316 F.2d 336, 339.

# 330

## III

The claimants argue strenuously that the documents in question should be submitted to the Court with a view to its determination through *in camera* inspection as to whether their production should be compelled. The Government, with equal vigor, contends that such a procedure would in the circumstances be unnecessary and improper, and urges that the privilege be sustained without further ado. The Court now addresses this issue,[50] remaining advertent to what has already been said that would have important bearing upon its resolution.

United States v. Reynolds [51] sets the guidelines by which the feasibility of *in camera* inspection is to be determined. In suits arising under the Federal Tort Claims Act from the death of three civilians in the crash of a military aircraft engaged in testing secret electronic equipment, a motion was made for production of the Air Force's report on the official investigation of the crash and the statements of surviving crew members made in connection therewith. Upon the Government's claim of privilege, production was ordered for *in camera* examination to ascertain whether the documents contained privileged material. This action was held to be erroneous. Admonishing that

"The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect." [52]

and after analogizing the privilege against self-incrimination, the Court elucidated:

"Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers. Yet we will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case. It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case,

---

50. The feasibility of an *in camera* inspection upon a claim of executive privilege was not in issue when this matter was previously before the Court. The Government had not produced any documents at that time, and there was no suggestion of executive privilege, ostensibly because no examination of the Department's files had then been made to ascertain precisely what they contained. The only question ripe for decision in the then posture of the litigation pertained to the adjustment properly to be made between the claimants' demand, supported by a general showing of relevance and good cause, and the burden the search was calculated to impose upon the Government. While the Government had advanced the attorney-client privilege and invoked the attorney's work-product rule, these claims, as it was held, could not be resolved without consideration of specific documents toward which they might be directed. See note 2, supra.

The Court was obviously in no position to determine any question of executive privilege "until there had been a formal claim of privilege." Thus "it was entirely proper to rule initially that" claimants "had shown probable cause for discovery of the documents. Thereafter, when the formal claim of privilege was" made "under circumstances indicating a reasonable possibility that" protected data "were involved, there was certainly a sufficient showing of privilege to cut off further demand for the documents on the showing of necessity for its compulsion that had then been made." United States v. Reynolds, supra note 7, 345 U.S. at 10–11, 73 S.Ct. at 533.

The observation in the prior opinion respecting in camera inspection was explicitly limited to the claims of attorney-client privilege and attorney's work-product, and the corresponding provision in the order must be similarly interpreted. The opinion and order left the Government free to assert any privilege it appropriately could, and this the Government has now done.

51. Supra note 7.

52. 345 U.S. at 8, 73 S.Ct. at 532.

the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.  *  * [53]

"On the record before the trial court it appeared that this accident occurred to a military plane which had gone aloft to test secret electronic equipment.  Certainly there was a reasonable danger that the accident investigation report would contain references to the secret electronic equipment which was the primary concern of the mission.  *  *  * [54]

"In each case the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate.  Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake.  A fortiori, where necessity is dubious, a formal claim of privilege, made under the circumstances of this case, will have to prevail." [55]

The Court concluded that since "necessity was greatly minimized by an available alternative" through pursuit of which the desired evidence might have been acquired "without forcing a showdown on the claim of privilege," the "dubious showing of necessity" had to succumb to the formal claim of privilege.[56]

■ As *Reynolds* holds, a court may not properly require an *in camera* inspec-

tion as a matter of course before accepting a claim of executive privilege.  And neither *Reynolds* nor succeeding decisions can be read to support a contention that such an examination is to follow automatically in cases where no military or diplomatic secrets are involved.  On the contrary, they make it clear that an *in camera* examination should be afforded only where a suitable occasion therefor sufficiently appears.[57]

· ■ While an *in camera* inspection is, just to that extent, a contraction of the privilege, courts should not hesitate to make a private examination of disputed materials upon a reasonable showing that it can serve a purpose truly useful to a party actually or potentially entitled to some discovery, for in no other way can judicial responsibility be discharged.  But the policy considerations supporting the privilege require a showing of such a degree of necessity as would justify an inquiry into the validity of the claim.  Such an inspection should not be directed without a definite showing of "facts indicating reasonable cause for requiring such a submission." [58]

■ *In camera* inspection in executive privilege cases is appropriate where it appears with reasonable clarity that the party seeking production is entitled to access to some of the materials demanded.[59]  Examination in this type of situation enables the separation of what should be disclosed from what should not be revealed.  Again, it may be that the balance between competing needs for con-

53. 345 U.S. at 9–10, 73 S.Ct. at 533.

54. 345 U.S. at 10, 73 S.Ct. at 533.

55. 345 U.S. at 11, 73 S.Ct. at 533.

56. 345 U.S. at 11, 73 S.Ct. at 534. ..

57. Kaiser Aluminum & Chemical Corp. v. United. States, supra note 12; Walled. Lake Door Co. v. United States, supra note 15.  See also Capitol Vending Co. v. Baker, supra note 36.

58. Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 948.

59. See Machin v. Zuckert, supra note 7, 114 U.S.App.D.C. at 340, 316 F.2d at 341; Boeing Airplane Co. v. Coggeshall, supra note 7, 108 U.S.App.D.C. at 114, 280 F.2d at. 662; O'Keefe v. Boeing Co., supra note .15, 38 F.R.D. at 336.

fidentiality and disclosure cannot be made without analysis of the disputed data.[60] Here the inspection enables the weighing to be done in the privacy of the judge's chambers. In each situation, however, a need, actual or potential, for production adequately appears, and the examination affords the means for fulfilling that need.[61]

■ That no such occasion is presented in this case is amply demonstrated, without plowing old ground, by brief reference to previous discussion. The claimants have not shown that they are or could be entitled to the documents the Government still retains. The Government, on the other hand, has made a substantial showing that everything that is withheld falls well within the scope and protection of the privilege, and it satisfactorily appears that the balance on disclosure or secrecy is decidedly in its favor. It is clear, too, that the claimants' projected investigation into the Government's decisional and deliberative processes is legally impermissible, and the circumstances rather plainly suggest that they have alternatives they might utilize to obtain that to which they may be entitled. Here inspection can satisfy no need for separation, for there appears nothing to separate; nor any need for balancing, with apparently nothing here to be weighed.

The claimants, however, contend for an *in camera* inspection for purposes of verifying that the content of the documents withheld is what the Government says it is. But to require examination here for that reason alone would mean not only an utter disregard for the affidavit of an executive with Cabinet status,[62] but also "the creation of an absolute right for judicial examination and determination of all evidence whose discovery the executive deemed contrary to the public interest."[63] The necessity the moving party must show is considerably more than a demand that someone other than his adversary look at the materials in question to make certain that statements as to their character are accurate.

■ In resolving the issue as to *in camera* inspection, the teachings of *Reynolds* must not be forgotten. The ultimate question is whether, in the circumstances of the case, the occasion for assertion of the privilege is appropriate. *In camera* inspection is not an end in itself, but only a method that may in given instances be indispensible to decision of that question. The court may be able to satisfy itself, without conducting an examination, that the privilege is sufficiently well founded, and if it does, divulgence even *in camera* is both unnecessary and improper. And the extent the court should investigate to satisfy itself in that regard depends on the caliber of the showing of necessity. Already, without actual examination of the documents, the Court has probed every facet of the Government's claim of privilege and has found it to be appropriately invoked, and the claimants' show-

---

60. See Westinghouse Electric Corp. v. City of Burlington, 351 F.2d 762, 767–771 (D.C.Cir.1965).

61. Three cases in this circuit, Westinghouse Electric Corp. v. City of Burlington, supra note 60, Machin v. Zuckert, supra note 7, and Boeing Airplane Co. v. Coggeshall, supra note 7, have in very recent years utilized the in camera inspection as the procedure appropriate for determinations in connection with claims of privilege not involving military or diplomatic secrets. In each, it appeared, before the inspection was ordered, that the claimant was entitled to some amount of discovery. In Machin and Boeing, the inspection became necessary in order that a separation of the privileged and unprivileged materials could be made, and in Westinghouse in order that the balance between disclosure and secrecy could be struck.

62. See cases cited supra note 36.

63. Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F.Supp. at 947.

ing of necessity is far too negligible to require or justify more.[64]

The Government's motion for modification will be granted. Counsel for the Government will present a suitable order.

---

64. See United States v. Reynolds, supra note 7, 345 U.S. at 11, 73 S.Ct. 528; Kaiser Aluminum & Chemical Corp. v. United States, supra note 12, 157 F. Supp. at 947–948.