*Lanpher v. Town of Morristown*, No. 20-2-16 Lecv (Carlson, J., Aug. 31, 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Lamoille Unit | CIVIL DIVISION<br>Docket No. 20-2-16 Lecv |

| | |
|---|---|
| Joyce Lanpher,<br>    Plaintiff<br><br>v.<br><br>Town of Morristown,<br>    Defendant | DECISION ON MOTION |

## Introduction

Plaintiff Joyce Lanpher worked as the operational lead for the Morristown Rescue Squad. Plaintiff has filed suit against Defendant Town of Morristown, arguing, *inter alia*, that she was wrongfully terminated based on her gender and in retaliation for her prior claims of gender-based discrimination. Plaintiff seeks to compel certain deposition testimony of Graham Govoni, who was President of the Rescue Squad at the time. In a deposition of Mr. Govoni on June 28, 2017, Mr. Govoni refused to answer questions regarding discussion regarding Plaintiff within a Morristown Selectboard executive session to which he was invited and which immediately preceded Plaintiff's termination. In his deposition, Mr. Govoni clearly indicated that Plaintiff's case was at least part of that session. "Any discussion that I might have had with the Selectboard regarding that are in executive session." Govoni Deposition at 98, attached to Town's Response to Motion.

Defendant maintains that Govoni's refusal was appropriate because a deliberative process privilege protects such discussions. Plaintiff argues that any such privilege is only a qualified privilege and her need for the information outweighs the considerations underlying any such privilege. Mr. Govoni is a Vermont attorney, but neither party is suggesting that his participation in the meeting was in that capacity. There is no claim of attorney client privilege at issue here. For the reasons stated below, Plaintiff's motion to compel is **GRANTED.**

## The Deliberative Process Privilege

It is currently unclear whether Vermont has adopted the deliberative process privilege,[1] though it seems that it either tacitly has or would if the issue was clearly before the Supreme Court. Vermont has recognized the common law executive privilege, which is often applied "with respect to intra-governmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies

---

[1] The Vermont Supreme Court discussed the deliberative process privilege in *Rueger v. Natural Res. Bd.*, 2012 VT 33, but ultimately found it inapplicable to the circumstances of that case, instead relying on the plain language of 1 V.S.A. § 317(c)(24).

are formulated." *Killington, Ltd. v. Lash*, 153 Vt. 628, 632 n.3 (1990) (quoting *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C.1966)).[2] However, in *Killington*, the Court only considered the privilege as it applied to communications to or from, or reports indicated for, the governor. *Id*.

Federal law tends to obfuscate the nomenclature, using "executive privilege," "deliberative process privilege," the "official information privilege," and the "intragovernmental opinion privilege" to refer to effectively the same thing: a privilege "designed to protect from public disclosure the opinions, recommendations and deliberations of government officials, where disclosure might impair, in one or another fashion, the effective functioning of the executive branch." *Walsh v. Chittenden Corp.*, 799 F.Supp. 405, 407 n.3 (D. Vt. 1992). In the federal context, the deliberative process privilege typically pops up in the context of Freedom of Information Act litigation, but it has its roots in the common law. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). At least one federal court has described the deliberative process privilege as a type of executive privilege. *Id*. Vermont has recognized that federal courts tend to use the terms interchangeably. *Rueger v. Natural Res. Bd.*, 2012 VT 33, ¶ 13, 191 Vt. 429 (citing *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975)).

Under either name, the privilege is qualified, rather than absolute. *Walsh*, 799 F.Supp. at 408 (quoting *In re Franklin Nat'l Bank Securities Lit.*, 478 F.Supp. 577, 580–81 (E.D.N.Y.1979)) (deliberative process privilege is a qualified, rather than absolute, privilege); *Killington*, 153 Vt. at 637 (executive privilege is qualified, rather than absolute). For the privilege to apply, the communication must be predecisional and deliberative. *In re Sealed Case*, 121 F.3d at 737. As a qualified privilege, it can be overcome by a showing of need, determined flexibly on an ad hoc basis. *Id*.

Assuming that Vermont has adopted the deliberative process privilege—since the Vermont Supreme Court recognized that federal courts use the phrase interchangeably with executive privilege—the Vermont Supreme Court's discussion of the contours of the executive privilege is instructive. In *Killington*, the Court explained, "'[W]hen a formal claim of executive privilege is made for confidential communications of the chief executive, or confidential communications of other government officials of an advisory or deliberative nature, there is a presumptive privilege, with the burden upon those seeking to compel disclosure.'" 153 Vt. at 638 (quoting *Hamilton v. Verdow*, 287 Md. 544, 563 (1980)). However, "where litigation concerns alleged governmental wrongdoing and the information sought is essential evidence, the very nature of the conflict between the interests of confidentiality and disclosure, while not determinative, will necessarily give some weight to the need for disclosure." *Id*. When such a privilege is asserted, the requester has the burden of showing that the need for the information outweighs the interest in confidentiality. *Id*. at 639.

In this case, Plaintiff wants to discover communications relating to her employment and termination, discussed by Selectboard members at an executive session. Although the facts are limited, it appears that such a discussion was predecisional (regarding Plaintiff's termination and occurring before the decision was made) and deliberative, and therefore would fall within

---

[2] Notably, the Vermont Supreme Court used the same language to define the deliberative process privilege in *Rueger*. 2012 VT 33, ¶ 14.

the purview of the privilege. The facts of the instant case, however, are exactly what the Vermont Supreme Court contemplated in *Killington*—Plaintiff is alleging government wrongdoing in the form of gender discrimination, and any discussions relating to the alleged discrimination constitute potentially essential evidence in her civil trial. Moreover, there does not appear to be any other means of learning of the substance of that conversation. The Selectboard's executive session is at least a highly plausible place where Plaintiff might find direct evidence that her gender was, or was not, a motivating factor in her termination. That is not by any means to assume anything about the nature of the actual discussion, but rather to observe that it was a conversation that stands well within any definition of the usual scope of discovery and, if any wrongful consideration was made, a place it was more likely to have been expressed than in any public or recorded setting. If the Town is concerned about general publication and knowledge of the session, that concern could easily be addressed by way of protective order limiting disclosure to the necessities of this case. The Court assumes the parties can agree on the form of any such order and submit it for the Court's formal issuance.

Accordingly, the Court concludes that with or without the existence of a deliberative process privilege, the facts of this case warrant Plaintiff's discovery of the executive session conversation as to Plaintiff and any other town employee whose employment or employment status was in any way directly related to Plaintiff's termination.

The Court further finds that given the first impression of the question posed, there is no good cause for an award of attorney fees in connection with the motion. The Court sees no bad faith in the situation, but rather an open question of law about which reasonable minds could differ.

So Ordered.


Electronically signed on August 31, 2017 at 11:57 AM pursuant to V.R.E.F. 7(d).


_____

Thomas Carlson
Superior Court Judge

3