**CHEMICAL MANUFACTURERS ASSOCIATION, Plaintiff,**

v.

**CONSUMER PRODUCT SAFETY COMMISSION, Defendant.**

**Civ. A. No. 84–1852.**

United States District Court, District of Columbia.

Dec. 24, 1984.

---

Robert M. Sussman, John F. Seymour, Covington & Burling, Washington, D.C., for plaintiff.

Daniel Bensing, Sp. Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Chemical Manufacturers Association ("CMA") sues under the Freedom of Information Act for an order compelling the Consumer Product Safety Commission (the "Commission") to make available certain documents generated in connection with a study of di-2-ethylhexyl phthalate ("DEHP"), a chemical used, *inter alia,* in the manufacture of certain toys for children. The study is being conducted for the Commission by the Inhalation Toxicology Research Institute ("ITRI") of the Department of Energy pursuant to a contract. The study is in two phases. Task I, now completed, developed a process to extract and measure the quantity of elements of DEHP in various consumer products. Task I also involved designing and conducting laboratory experiments to determine the manner and extent to which DEHP passed from the products containing it to the consumers coming in contact with the products or inhaling fumes from their incineration. Task II investigated further the effect of human saliva on such prod-

ucts and the effects of DEHP in such specific products as pacifiers, teethers, and other soft plastic toys which small children put in their mouths. As a result of these studies, and despite objections by CMA, the Commission convened a Chronic Hazard Advisory Panel ("CHAP") to evaluate the studies and to advise whether regulatory action is indicated.[1] 48 Fed.Reg. 56,628 (December 22, 1983).

Meanwhile, CMA established its own Phthalate Esters Panel. CMA and its Panel have persistently sought the documents generated by ITRI, reviewed them and "raised questions concerning the reliability and reproducibility of the data contained in the documents." Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 6 [hereinafter referred to as Plaintiff's Memorandum]. Over time the Commission granted some, but not all, of these requests and indeed has released some materials since this suit was filed. According to Plaintiff's Memorandum at 9, the following categories of documents, all generated after July 12, 1983 in connection with Task II, remain undisclosed.

1. Draft copies of the Task II report, "Phthalate Ester Migration from Polyvinyl Chloride Consumer Products," dated July 31, 1984;

2. ITRI monthly progress reports for certain months in 1983 and 1984;

3. A draft protocol of an experiment designed to explore the variability of the migration data; and

4. One page of data dated April 4, 1984.

FOIA exemption (b)(5) provides that an agency need not disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). CMA acknowledges that exemption (b)(5) protects deliberative materials that describe the manner in which policy or legal

---

1. CMA argued that appointment of a CHAP was premature. Letter of Geraldine Cox, Ph.D., to Dr. Peter Preuss, dated November 7, 1983 (Plaintiff's Exhibit A).

interpretations are formulated. *See, e.g., EPA v. Mink,* 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973). CMA's argument centers on the notion that scientific reports are not exempt under (b)(5) because they are not documents that reveal the process by which an agency formulates law and policy.

CMA argues that the Courts have consistently held that documents are part of the pre-decisional process exempt from disclosure under (b)(5) only if they make recommendations or express opinions about legal or policy matters. *See, e.g., Jordan v. United States Department of Justice,* 591 F.2d 753, 772–74 (D.C.Cir.1978) (en banc). As the Court of Appeals stated in *Vaughn v. Rosen,* 523 F.2d 1136 (D.C.Cir. 1975):

> [I]t is not enough to assert, in the context of Exemption 5, that a document is used by a decisionmaker in the determination of policy. Unevaluated factual reports or summaries of past administrative determinations are frequently used by decisionmakers in coming to a determination, and yet it is beyond dispute that such documents would not be exempt from disclosure. Rather, to come within the privilege and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters. Put another way, pre-decisional materials are not exempt merely because they are predecisional; they must also be a part of the agency give-and-take—of the deliberative process—by which the decision itself is made.

*Id.* at 1143–44 (footnotes omitted). CMA then argues that the courts have flatly refused to characterize scientific and technical reports as deliberative documents.

Our Court of Appeals has observed, in dicta, that exemption (b)(5)

> encourages the free exchange of ideas among government policy makers, but it

does not authorize an agency to throw a protective blanket over all information by casting it in the form of an internal memorandum. Purely factual reports and scientific studies cannot be cloaked in secrecy by an exemption designed to protect only "those internal working papers in which opinions are expressed and policies formulated and recommended."

*Bristol-Myers Company v. FTC,* 424 F.2d 935, 939 (D.C.Cir.1970) (quoting *Ackerly v. Ley,* 420 F.2d 1336, 1341 (D.C.Cir.1969)), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). Other courts have reached the same conclusion. *See, e.g., Parke, Davis & Co. v. Califano,* 623 F.2d 1, 6 (6th Cir.1980) ("The documents in dispute here do contain opinions of medically and scientifically trained persons. However, unless the opinion of an expert somehow reflects the deliberative process of decision or policy making, the opinion as such does not come within the exemption."); *Ethyl Corporation v. Environmental Protection Agency,* 478 F.2d 47, 50 (4th Cir.1973).

CMA thus rests its argument that the (b)(5) exemption does not apply to the documents that it seeks primarily upon a distinction between legal or policymaking documents reflecting "advisory opinions, recommendations or deliberations comprising part of the process by which policies or legal issues are formulated," all of which CMA acknowledges to be exempt, and scientific reports which, CMA claims, are not exempt. Plaintiff's Memorandum at 14. According to CMA, disclosure of the documents here sought "will improve the deliberative process by ensuring that factual, raw materials used for decision-making by the Commission have been subjected to public scrutiny." Plaintiff's Memorandum at 25–26.[2]

As a first fallback position, CMA contends that even if the documents are deliberative, they have lost any exemption to which they might otherwise be entitled be-

---

**2.** However, each case primarily relied upon by CMA involved disclosure of scientific materials *after* a decision based on these materials had

already been made. These disclosures included drafts of such documents as well as those in final form. *See* page 117 *infra.*

cause the Commission has already published most of the documents it originally sought to withhold. In addition, CMA argues that the Commission has already acted on the information in August 1983. The Commission's staff published a so-called "briefing package" which tentatively concluded that "use of DEHP in children's products may result in a substantial exposure of children to a substance that is known to cause cancer in animals." Memorandum from Sandra Eberle to the Commission, dated August 31, 1983, at 1 (Plaintiff's Exhibit C). After publication of this staff briefing package, the Commission referred the underlying material to CHAP for assessment of the health risks associated with exposure to DEHP. According to CMA, this reference to CHAP for further study is agency action which dissolves any pre-decisional privilege deriving from exemption (b)(5). Finally, CMA urges that even if some portions of the documents are exempt from disclosure as deliberative, the factual material should be disclosed after redaction of the privileged elements.[3]

The Commission opposes disclosure of the disputed documents on the theory that they "reflect the deliberative process by which the Commission and ITRI scientists are working toward a final report of the Phase II DEHP study." Defendant's Statement of Material Facts as to Which There Is No Dispute at ¶ 11. As authority, the Commission invokes the Supreme Court's statement that the purpose of exemption (b)(5) is to "prevent injury to the quality of agency decisions." *N.L.R.B. v. Sears Roebuck & Co.*, 421 U.S. 132, 151, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). The Commission also refers to Judge Wilkey's statement of the objectives of exemption (b)(5), which include the protection of "the integrity of the decision-making process itself by confirming that 'officials should be judged by what they decided[,] not for matters they considered before making up their minds.'" *Jordan v. U.S. Dept. of Justice, supra* at 773 (quoting *Grumman Aircraft Eng. Corp. v. Renegotiation Board*, 482 F.2d 710, 718 (D.C.Cir.1973), *rev'd on other grounds*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975)).

The Commission emphasizes that the documents involve "candid scientific discussions over the interpretation of preliminary test results and suggestions and opinions which may or may not be reflected in the final report." Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment at 12. Moreover, the Commission argues, CMA may try to use these data before CHAP and the Commission have finished considering them in order "to lobby the Commission to affect the ultimate contents of the [Task II] report." *Id.* Finally, the Commission represents that it anticipates completing and publishing the Task II study by the end of the year and "disclosing much of the material currently being withheld at that time." *Id.* at 13 n. 12.

The Commission cites no direct authority (and the Court has discovered none) to support its claim that pre-decisional scientific exchanges are made privileged by exemption (b)(5). On the other hand, none of the cases cited by plaintiff to distinguish exemption policy and legal documents from disclosable scientific and factual papers require disclosure while the deliberative process is in mid-stream.[4] It may be that criticism of the underlying data could improve the decisionmaking process, in the way that any peer review could sharpen the work product. But there is time enough for adversary testing when the Task II report is published. It is also immediately apparent how an organization like CMA could delay and disrupt any process that might culminate in costly regulation of a profitable product, if it were provided with predecisional documents like

---

3. CMA also argues that Commission drafts are disclosable because of a Commission regulation which treats drafts "no differently from other documents requested under the FOIA." 45 Fed. Reg. 22,022 (April 3, 1980).

4. *See* pages 115–116 *supra*.

those that the CMA seeks for its Panel. Experts do, after all, disagree. Where a government regulatory body is moving rapidly to reach a decision about whether products used by children cause cancer, agency scientists may, for example, discuss hypotheses which have not matured, and can be effectively shared only with peers in regular and confidential communication. For example, disclosure of an internal hypothesis or the data related to its formation followed by a demeaning attack on that hypothesis before the author has finally formed a conclusion would have an obvious chilling effect on the persons still in the process of forming the opinion, and those who follow in the same process.[5] The scientist whose work was assailed would not be able to make a defense by pointing to a finished product, but would be forced to endure the embarrassment of premature criticism. Just as factual information contained in witness' statements may be withheld when disclosure would hamper the government's deliberative processes "by making it difficult for the government to obtain essential information," *Deering Milliken, Inc. v. Irving*, 548 F.2d 1131, 1138 n. 9 (4th Cir.1977), so scientists should be able to withhold nascent thoughts where disclosure would discourage the intellectual risk-taking so essential to technical progress. Moreover, the plaintiff in this case need delay its parallel process for only a few weeks more, after which, the Commission indicates, the documents sought will be forthcoming.

■ Courts are being reminded more and more about the deference that they owe to administrative agencies in regard to the way these agencies conduct their business. *See generally Allen v. Wright*, —— U.S. ——, 104 S.Ct. 3315, 3329–30, 82 L.Ed.2d 556 (1984); *Women's Equity Action League v. Bell*, 743 F.2d 42, 43 (D.C. Cir.1984). There should be considerable deference to the Commission's judgment as to what constitutes, as our Court of Appeals has put it, "part of the agency give-and-take—of the deliberative process—by which the decision itself is made." *See Vaughn v. Rosen, supra*, 523 F.2d at 1144. The Commission is better situated than either CMA or this Court to know what confidentiality is needed "to prevent injury to the quality of agency decisions," *N.L. R.B. v. Sears Roebuck & Co., supra*, 421 U.S. at 151, 95 S.Ct. at 1516, while the decisionmaking process is in progress. Closer scrutiny and fuller disclosure after the Commission has published its study will be less likely to cause such injury. Because the documents in this case are intimately involved in an ongoing policy making process, nondisclosure is, *at the moment*, essential. The documents are therefore protected under the deliberative process privilege and are exempt from disclosure under (b)(5).

■ There is an instructive parallel in Rule 26(b)(4) of the Federal Rules of Civil Procedure. Rule 26(b)(4) sets forth the circumstances under which a litigant may discover the work of an expert who has been retained by an opponent "in anticipation of litigation." An agency like CMA, which is taking steps toward product regulation, proceeds with the prospect of litigation in mind. According to the Commission, proposals for regulation of products like DEHP are almost invariably litigated. Defendant's Supplemental Memorandum at 3. The work of the Commission and the ITRI's scientific staff is thus somewhat analogous to that of an expert preparing for trial. Rule 26(b)(4) precludes discovery of experts who, like the CMA's staff, will not be called to testify at trial, except "upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts

5. As Dr. Charles Hobbs, Assistant Director of ITRI, noted in his declaration:
   > [B]oth the monthly reports and draft final reports are iterative documents. The premature release of these monthly reports and draft reports could result in the release of incompletely interpreted information. Premature release of monthly reports could also inhibit open and timely communications between the ITRI investigators and the agency sponsoring the research.
   Hobbs Declaration at ¶ 17.

or opinions by other means." Indeed, material prepared in anticipation of litigation by an expert not expected to testify at trial is exempt from disclosure under (b)(5). *See Hoover v. United States Department of the Interior,* 611 F.2d 1132 (5th Cir.1980); *Deering Milliken, Inc., supra,* at 1138. Moreover, Rule 26(b)(4) reflects a concern for the timing of the discovery that it does permit. *See* Rule 26(b)(4) ("facts *known* or opinions *held* by experts") (emphasis added); Rule 26(b)(4) Advisory committee comments ("discovery [of experts] is limited to trial witnesses, and may be obtained only at a time when the parties know who their experts will be"). At this point, the plaintiff can obtain the information by waiting until the Commission releases it following publication of the final Task II report. This short delay will prevent the plaintiff from taking unfair advantage of the Commission's expertise, *compare Pearl Brewing Co. v. Joseph Schlitz Brewing Co.,* 415 F.Supp. 1122, 1138 (S.D.Tex.1976), and from interfering with the Commission's experts before their opinions are fully and finally formed. If the Commission delays the release of the documents at issue, there will come a time when such delay might constitute an "exceptional circumstance" making it "impracticable" for the CMA to obtain the scientific information at issue by the simple expedient of being patient. At that point, the (b)(5) exemption developed here by analogy to Rule 26(b)(4) might no longer be applicable. But that time has not yet arrived.

In reaching this decision, the Court has considered plaintiff's contention that the Commission's reference to CHAP was the culmination of a deliberative process so that defendant is in fact seeking post-decision disclosure. This contention is inconsistent with the factual context; the reference to the CHAP was obviously an interim step in a deliberative process that will not apparently culminate until publication of the Task II report a few weeks hence.

Nor does the Commission regulation equating drafts with final copy require disclosure before the agency action contemplated by the deliberations now in progress. If, after the Task II study is published, or has been unreasonably delayed, *see Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984), the Commission continues to withhold the documents at issue here, the Court could reconsider any exemption then claimed for them, and, if necessary, conduct an *in camera* review to redact only the privileged portion and require disclosure of the balance.

In view of the foregoing, an accompanying order grants defendant's motion for summary judgment and denies plaintiff's cross-motion.

### ORDER

For the reasons set forth in the accompanying memorandum, it is this 21st day of December, 1984, hereby

ORDERED: that the plaintiff's cross motion for summary judgment be, and is hereby, DENIED; and it is further

ORDERED: that the defendant's motion for summary judgment be, and is hereby, GRANTED; and it is further

ORDERED: that plaintiff's complaint be, and is hereby, DISMISSED.