Bork, Circuit Judge, dissented and filed opinion.

**Sidney M. WOLFE, M.D., et al.**

**v.**

**DEPARTMENT OF HEALTH & HUMAN SERVICES, Appellant.**

No. 86–5017.

United States Court of Appeals, District of Columbia Circuit.

Argued May 14, 1986.

Decided April 7, 1987.

Rehearing En Banc Granted July 2, 1987.[*]

* Judgment, opinion of the court, and the dissenting opinion are vacated.

James M. Spears, Deputy Asst. Atty. Gen., with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman and Alfred R. Mollin, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

William B. Schultz, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on the brief, for appellees.

Before ROBINSON and BORK, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the court filed by Senior Circuit Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge, BORK.

J. SKELLY WRIGHT, Senior Circuit Judge:

The plaintiffs-appellees, members of the Public Citizen Health Research Group, requested access under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.* (1982), to some of the information contained in a "Regulations Log" maintained by the Department of Health and Human Services (HHS). The Department refused plaintiffs' requests, contending that the information sought was exempt under FOIA Exemption 5, which shields from disclosure those documents that would not be routinely available in civil litigation with the agency. The government claimed that the log information should be considered privileged and thus exempt under the deliberative process privilege. Although the government raised only the common law dimension of the privilege in the District Court, it raises the constitutional aspect of the privilege as well before this court. The District

Court rejected the government's argument, and we now address on appeal the proper scope of the privilege claimed and therefore of Exemption 5 as well.

### I. FACTUAL BACKGROUND

Plaintiffs filed the instant FOIA request in order to locate the cause of what they allege to be unreasonable delay in issuance of Food and Drug Administration (FDA) regulations. This case is part of a larger attack by plaintiffs and other individuals and organizations on the increasing centralization of rulemaking authority within the Executive Branch. Two developments within the last six years have sparked this attack. First, in 1981 the Secretary of HHS withdrew the delegation of power to the FDA to issue regulations that it deemed in the public interest. Instead, such regulations now must first be reviewed and approved by the Secretary. *See* 21 C.F.R. § 5.11 (1985). Second, the President issued Executive Order 12291 (Feb. 17, 1981), which requires all agencies considering issuance of a rule to submit the rule for review by the Office of Management and Budget (OMB). OMB scrutinizes the rule for consistency with presidential policies and for cost efficiency. Thus, before a rule proposed by FDA may be issued it must be approved first by the Secretary of HHS and then by OMB.

In essence, plaintiffs wish to know how long rules proposed by FDA are spending at each stopping point along the approval route from FDA to HHS to OMB and back to HHS, so that they can identify and contest delays in issuance of FDA regulations. Plaintiffs began by submitting on July 18, 1984 a written request to HHS for access to records indicating which FDA proposals were then pending for review by HHS or OMB. HHS denied this request by letter dated August 23, 1984 on the ground that the information sought is exempt from disclosure under FOIA Exemption 5. Plaintiffs renewed their request by letter dated March 7, 1985, to which they received no formal response. Plaintiffs then filed this action in the District Court on April 1, 1985. By letter dated April 16, 1985 plain-

tiffs submitted to HHS a second request for the same information and in addition sought access to the dates of transmittal of proposed rules from FDA to HHS, from HHS to OMB, and from OMB back to HHS. On April 19, 1985 HHS denied this second request on the same ground as the denial of the first request. On April 25, 1985 plaintiffs appealed by letter their April 16 request. The appeal was formally denied on May 31, 1985. On June 14, 1985 plaintiffs amended their complaint in this action to include their second request.[1]

While plaintiffs' case was pending in District Court, HHS disclosed that it maintains a Regulations Log that lists by title regulatory action proposed by FDA (and other branches of HHS), the date on which the action was received by HHS, and, if applicable, the date on which HHS sent it on to OMB. The log also contains information about the offices and persons within HHS to which the matter has been routed, but plaintiffs have *not* sought access to this information. Nor do plaintiffs seek access to the specific substance of the proposed rules. They seek only the dates on which the proposals, identified only by their title, were transmitted from one agency to another. This information will usually reveal whether and when FDA proposes rulemaking and whether and when such proposals are approved by HHS and OMB.

The District Court ruled that FOIA Exemption 5 did not apply to this case because the log information does not fall under the deliberative process privilege as the government claimed. District Judge Pratt reasoned that none of the policies underlying the privilege would be significantly implicated by disclosure of the requested material and concluded that the mere fact that "*a* recommendation has been made by one agency to another" is not information "sufficiently 'deliberative' to trigger the protections of the privilege." Memorandum Opinion, 630 F.Supp. 546 (D.D.C.1985) (hereinafter Mem. Op.) at 550, Joint Appendix (JA) 79–80. Accordingly, the District Court granted summary judgment for plaintiffs, denied defendant's cross-motion for summary judgment, and ordered disclosure of the requested information within 30 days. HHS filed a timely appeal, and on January 17, 1986 a panel of this court granted the agency's unopposed motion for a stay of the District Court's order pending appeal. For the reasons cogently set forth by the District Court and elaborated below, we affirm the grant of summary judgment to plaintiffs.

## II. The Common Law Deliberative Process Privilege

■ The government relies heavily on appeal (and relied exclusively in the District Court) on the common law deliberative process privilege. This privilege, which shields predecisional advisory opinions and recommendations from disclosure, is uncontrovertedly meant to promote candor in governmental deliberations. Indeed, the legislative history of Exemption 5 states explicitly that the purpose of the exemption is to encourage "frank discussion of legal and policy issues." S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965); *see* H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966). In light of this clear purpose, the Supreme Court and this circuit have uniformly held that the privilege protects only predecisional opinion, not purely factual information that does not reveal the substance of predecisional opinion.[2] *See EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119

---

1. The government argues in a footnote in its brief that, to the extent that plaintiffs' case turns on their first request, their claim should be dismissed for failure to exhaust their administrative remedies. *See* Brief for Appellant at 10 n. 8. We reject this argument. The second request encompassed the subject matter of the first and was fully pursued through the administrative appellate scheme. Any failure to appeal the denial of the first request is thus irrelevant.

2. Of course, when factual material does reveal the substance of predecisional opinions, it receives the same protection that the opinions themselves would receive if directly revealed. *See Montrose Chem. Corp. v. Train*, 491 F.2d 63, 68 (D.C.Cir.1974) (compilation of facts by aides to the EPA Administrator revealed what information they "cited, discarded, compared, evaluated, and analyzed," and thus constituted "an improper probing of the mental processes behind the decision of an agency").

(1973); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C.Cir.1980); *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C.Cir.1980).

■ Although the opinion/fact distinction is a useful vehicle for promotion of candor, it may nonetheless generate controversy over whether particular information is properly deemed "fact" or "opinion." On the one hand, the government argues that the log in question constitutes "opinion" because the fact that a proposal for regulation has been transmitted from FDA to HHS, or from HHS to OMB, or back to HHS from OMB, usually reveals that the transmitting agency has tentatively approved the proposed regulation. *See* Brief for Appellant at 25–26. On the other hand, plaintiffs maintain that the titles and dates contained in the log entries are merely information about the *status* of the proposed rules, detailing when and before whom they are pending. *See* Brief for Appellees at 8, 12. The applicability of the privilege and thus the exemption turns on which of these competing characterizations is accepted.

Characterization of the information at issue is a "novel" question of law not easily resolved by precedent.[3] *See* Mem.Op. at 547, JA 72. Nor is the question easily resolved by precedent.[3] *See* Mem.Op., 630 F.Supp. at 547, JA 72. Nor is the question easily resolved by logical deduction. Information does not come neatly labelled as "fact" or "opinion." There are bound to be hard cases like the one before us in which plausible arguments can be made on either side, and the angle from which the information is viewed and the light shed upon it by the viewer will determine whether it is per-

adopted by the District Court is *not* to label the information conclusorily as fact or opinion, but rather to classify it *in light of the policies and goals that underlie the deliberative process privilege.* *See* Mem.Op., 630 F.Supp. at 550, JA 78.

The dissenting opinion seems to miss this crucial point, which forms the framework of our analysis. In order to reach its conclusion that the log information is protected by the deliberative process privilege, the dissent *assumes* that the log information is "recommendation" or "opinion" when that is precisely the point at issue. The dissent thus sidesteps the central issue in this case. The resolution of this issue is not nearly as simple as the dissent pretends, because the log information can plausibly be characterized in at least two competing and contradictory ways. Having wholeheartedly adopted the government's characterization, the dissent is shocked to find us considering the policies underlying the privilege to see if it protects the log information. But we advert to the policies underlying the deliberative process privilege *not* to perform some sort of superfluous balancing test to see if the privilege really does protect "deliberative" material, but rather to decide whether the dates and titles sought by the plaintiffs can fairly be characterized as "deliberative" in the first place. Reference to these underlying policies in this case makes clear that the log information, which reveals only whether and when a recommendation has been made and not what the substance of that recommendation is, cannot accurately be characterized as "opinion" or "recommendation" because its disclosure would endanger none of the goals legitimately protected by the privilege.

---

3. The dissent bizarrely concludes that the decisions in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975); and *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C.Cir.1980), "require" the conclusion that the log information is protected by the deliberative process privilege. These cases, however, largely concern whether certain documents are "predecisional." This is not an issue in the instant case, as we grant the uncontroversial contention that the log informa-

tion is "predecisional." The central issue before us is whether the log information is "deliberative," on which the three cases cited by the dissent offer no direction. All of those cases involve memoranda chock-full of "analysis[,] * * * evaluation * * * [and] recommendation." *Grumman*, 421 U.S. at 174, 95 S.Ct. at 1495. They offer no guidance in determining whether the dates and titles involved here can likewise be considered "deliberative." This is clearly a matter of first impression, as the District Court recognized.

The general purpose of the privilege, as noted above, is to encourage frank and full predecisional discussion by government officials free from fear of ridicule or misunderstanding by the public. The government argues that disclosure of the log information to the plaintiffs will impair these goals in four ways.

First, and least persuasively, the government suggests that disclosure of the dates on which decisions are reached will impair "measured and deliberate appraisal of the issues" and lead to "precipitous" decisions because the public will be able to attribute delay to specific decisionmakers. Brief for Appellant at 29. Disclosure of the log information, however, will *not* permit attribution of delay to individuals, only to agencies. Thus it seems implausible that the many individuals employed by the agencies and involved in the decisionmaking process will feel personally scrutinized for any delay. Even more implausible is the government's central proposition that attribution of delay will lead to hasty decisionmaking. As plaintiffs wryly note, they have been attributing delay to various agencies for years, and hasty decisionmaking has certainly not been the result. Finally, the ability of the public to attribute unjustified delay to specific agencies is in accord with the general goal of FOIA—promoting government accountability. Unless the government can present some evidence that disclosure will inhibit the decisionmaking process—which, after all, is what the privilege is designed to protect—the public has a right to know the source of decisional delay. The government's fear of "precipitous" decisions is entirely speculative.

Second, the government argues that disclosure of the log information will ultimately inhibit individual decisionmakers from expressing their disagreement with a proposal because the logs will identify which agency was the stopping point for a proposed regulation. To address this argument, it is important to clarify exactly what information the logs reveal. Plaintiffs have requested only the titles and dates of transmittal of proposed regulations. The titles identify only the very broadest area of regulation under consideration; they may be as general as "Caffeine" or "Bubble Bath Products." *See* Current and Projected Rulemakings, Unified Agenda, 50 Fed.Reg. 17251, 17280 (April 29, 1985), JA 25, 34. Thus the dates of transmittal between agencies tell plaintiffs simply that the transmitting agency has probably tentatively approved some regulatory change—which could entail either increased or decreased regulation—in a very broad field, and the lack of transmission after a certain point probably indicates that the last agency decided *not* to approve some regulatory change in that field. As this circuit has held, "To test whether disclosure of a document is likely to adversely affect the purposes of the privilege, courts ask themselves whether the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency[.]" *Coastal States*, 617 F.2d at 866. The agency's general position as inferred from its transmittal of a proposed regulatory change is hardly information very "candid or personal" in nature. Moreover, it is highly implausible that individual decisionmakers within an agency will be reluctant to discuss their specific views on the precise regulations before them simply because the agency's very general disposition will ultimately be revealed. The precise regulation at issue, the arguments made about it, the reasons for the agency's decision, and the decisionmakers involved are *not* sought by plaintiffs; the very general information they do seek is unlikely to reduce the candor of deliberations within the agency's walls.

Moreover, the new procedures adopted by OMB's Office of Information and Regulatory Affairs (OIRA), which permit public access to all correspondence exchanged between OIRA and the head of an agency during the review process after final action is taken, *see* letter of August 15, 1986 from the Department of Justice to the Clerk of this court, suggest that OMB does not believe that public knowledge of OMB's disposition of the proposed rules that come before it will "chill" decisionmakers' candor in considering those rules.

The government's third argument is that disclosure of the log information will confuse and mislead the public because the agency that has tentatively approved a regulation could change its mind. The government here misunderstands the concern that underlies application of the privilege. Although the government cites the *Coastal States* case, Brief for Appellant at 33, it neglects that portion where this circuit made clear that the privilege is meant "to protect against confusing the issues and misleading the public by dissemination of documents *suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action."* *Coastal States*, 617 F.2d at 866 (emphasis added). The information sought by plaintiffs, which would indicate simply agency approval or disapproval of regulatory change in a very broad area, poses little danger of misleading the public by false rationales since no rationale at all will be disclosed. In any case, it appears highly unlikely that the dates and titles contained in the log will mislead in *any* fashion the informed public seeking access to it, or anyone else.

Finally, the government maintains that the privilege should shield the log information because disclosure will permit and encourage increased and more focused lobbying. Once again, the government misunderstands the purposes of the privilege. The privilege is meant to ensure that agency deliberations are conducted with frankness, without fear that each tentative word or thought will be subject to public scrutiny. But the privilege is *not* meant to isolate agency decisionmakers from public opinion or to silence public voices. Indeed, FOIA itself, to which the privilege is a narrow exception, is premised on the contrary view—that the government should be accountable to the public for its actions. No case holds that fear of increased lobbying alone is sufficient to bring information within the scope of the privilege and the exemption.[4]

In sum, none of the government's arguments demonstrates a significant threat to any of the policies and goals that inform the deliberative process privilege. It is reference to these policies that should determine whether information is labelled "fact" or "opinion" and thus whether it is shielded by the privilege. After reviewing the government's arguments in light of the manifest purposes behind the privilege, we must agree with the District Court that the regulatory log at issue constitutes "fact" because it is insufficiently "deliberative" to claim the protection of the privilege:

### III. THE CONSTITUTIONAL EXECUTIVE PRIVILEGE

■ The government relied exclusively on the common law deliberative process privilege in its argument before the District Court. For the first time on appeal it raises the argument that the constitutionally based executive privilege protects communications between HHS and OMB (but not between FDA and HHS). Although the District Court did not address this argument, we are persuaded for reasons similar to those relied upon by Judge Pratt and discussed above in the common law context that the constitutional branch of the privilege offers no more support to the government than the common law branch.

Confidential communications to and by the President are protected by a privilege of constitutional underpinnings. The rationale that supports this privilege is similar to the concerns that underlie the common

---

4. The dissent attempts to refute this point and thus rescue the government's "lobbying" argument by citing *Chemical Manufacturers Ass'n v. Consumer Prod. Safety Comm'n,* 600 F.Supp. 114 (D.D.C.1984), and *Tax Reform Research Group v. IRS,* 419 F.Supp. 415 (D.D.C.1976). This attempt is unavailing. Both of these cases clearly premise their invocation of the deliberative process privilege on the need to promote *candor* in deliberations—a *separate* point pressed by the government. *See Chemical Manufacturers Ass'n,* 600 F.Supp. at 118 (disclosure of predecisional scientific exchanges might have a "chilling effect" that would "discourage intellectual risk taking"); *Tax Reform Research Group,* 419 F.Supp. at 423 (disclosure of names of individuals involved in IRS decisionmaking might have "chilling effect" on the "openness" of their comments and advice). Neither case suggested that the mere desire to avert lobbying alone, *aside* from its effect on candor, was enough to bring the deliberative process privilege into play.

law deliberative process privilege—to ensure full and frank discussions between the President and his advisors. Although the government argues that the constitutional privilege is broader in scope than the common law privilege, there is no doubt that some threat to the policies that underlie the privilege must still be found before information that is not clearly "deliberative" is shielded from public view. For the reasons stated above in the common law context, no such threat is evident. Moreover, even if such a threat were found to exist, extension of the presidential privilege to the OMB is unprecedented and unwarranted. The President himself and communications with him are not implicated in any way by the OMB review process; to extend the privilege to OMB invites extension to the entire Executive Branch, which would create an unnecessary sequestering of massive quantities of information from the public eye.[5] We cannot find that the log at issue in this case is protected by the Executive's constitutional privilege.

## IV. ABANDONING THE FACT/OPINION DISTINCTION TO PROTECT THE DELIBERATIVE PROCESS

The government makes a somewhat confusing argument that the deliberative process privilege protects not only deliberative materials, but the deliberative process itself. Although no case relied upon by the government supports it, the government seems to be arguing that we should *abandon* the fact/opinion distinction and instead ask whether disclosure of the information at issue, be it fact *or* opinion, would "disrupt" the decisionmaking process even if it did not reveal the substance of predecisional recommendations. *See* Brief for Appellant at 20. We cannot accept this argument. The Supreme Court and this circuit have explicitly endorsed the fact/opinion

distinction, making clear that the revelation of predecisional recommendations is the touchstone for the application of the deliberative process privilege. *See Mink,* 410 U.S. at 89, 93 S.Ct. at 837; *Coastal States,* 617 F.2d at 867; *Ryan,* 617 F.2d at 790; *Montrose Chem. Corp.,* 491 F.2d at 66–67; *Soucie v. David,* 448 F.2d 1067 (D.C.Cir. 1971); *see also Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D.D.C.1966), *aff'd,* 384 F.2d 979 (D.C.Cir.), *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). None of the cases cited by the government overrules or questions the appropriateness of the distinction or the rationale underlying it. Accordingly, we are bound to follow the clear and firmly rooted precedent of the Supreme Court and our own circuit.

Moreover, even were we not so bound, the standard proposed by the government merely duplicates the analysis already appropriate under the current standard. To determine whether information that is not clearly "deliberative" should be deemed fact or opinion, courts should look to the policies underlying the privilege. In so doing they must ask whether disclosure would restrain the candor of governmental deliberations or lead to confusion on the part of the public as to the reasons for governmental action. Thus, under the current standard, we *already* ask whether the deliberative process would be impaired and invoke the privilege if we find that it would be. The government suggests that the privilege should also apply to impairment *other* than restraint of candor or public confusion. While there may in fact be other forms of disruption or impairment, they are clearly *not* encompassed by the privilege as understood by the Congress in creating FOIA Exemption 5 or by the Supreme Court and this circuit in interpreting it. The courts' interpretation of the privi-

---

**5.** The dissent suggests that we could avoid the slippery slope of immunizing all Executive Branch communications from disclosure under FOIA by examining in each case the extent to which the agency is acting as delegate of the President as opposed to a delegate of Congress. Given that most executive agencies, like the OMB, act under *both* congressional statutory mandate and presidential authority, the dis-

sent's suggestion is unacceptably manipulable and incapable of drawing a principled line short of the massive sequestering of information we fear. Moreover, such an open-ended proposal seems odd indeed in the same opinion that worries that our analysis of the policies underlying the privilege will prove "impossible for courts to administer" and lead to a "waste of judicial time and energy." Dissent at 1537.

lege makes quite clear what sorts of "impairment" are properly embraced by the protection of the privilege. Hence, we cannot agree with the government's proposed revision of the standard.

## V. Conclusion

We find that neither the common law deliberative process privilege nor the constitutional Executive privilege encompasses the log information sought by plaintiffs. Nor are we willing to abandon the fact/opinion distinction emphatically endorsed by the Supreme Court in determining the applicability of the privilege. We thus conclude that the District Court's judgment should be, and it is hereby,

*Affirmed.*

BORK, Circuit Judge, dissenting:

The majority today requires disclosure under the Freedom of Information Act ("FOIA") by the Department of Health and Human Services ("HHS") of its Regulations Log. The Log discloses that proposals have been made, and accepted or rejected at various levels of review, to regulate various subject matters within the jurisdiction of the Food and Drug Administration ("FDA"). These proposals are pre-decisional recommendations and hence clearly insulated from disclosure by Exemption 5 of the FOIA. The majority reasons, however, that making public the Regulations Log discloses agency recommendations at a broad enough level of generality to render them "insufficiently 'deliberative' to claim the protection" of the FOIA's Exemption 5. Maj. op. at 1532. Because Exemption 5 protects from disclosure all pre-decisional recommendations, and because today's ruling will significantly impair the intended purposes of that exemption, I cannot accept the majority's conclusion.

## I.

When a proposal to regulate is fully formulated it is published by the agency for notice and comment. At that stage the public learns what is proposed and why. Similarly, when, after the comments have been considered, a final rule is adopted or rejected, the public is fully informed about what the agency has done and why it has done it. The majority holds that plaintiffs are entitled under the FOIA to learn more about the deliberative process that precedes these stages.

The Regulations Log maintained by HHS lists by title all regulatory actions proposed by the FDA, the date HHS received the proposal from the FDA, and, if HHS approves the proposal, the date it was transmitted to the Office of Management and Budget ("OMB"). Plaintiffs state that they already know the identity of important regulations and other FDA projects under consideration because "these matters are generally known to those with an interest in the FDA." Brief of Appellees at 3. In addition, as plaintiffs point out, the FDA publishes a semi-annual Regulatory Agenda that lists all current and projected rulemakings being considered by the FDA, all existing FDA regulations presently under review, and all actions that have been completed by the FDA within the prior six months. *Id.* Thus, if the Regulations Log is made public and shows a transmittal from the FDA to HHS, it is known that the FDA has proposed to regulate a particular subject, and if no transmittal is shown, it is known that the FDA has decided not to recommend such regulation or not to recommend it yet. If no transmittal to OMB is shown, HHS is known to have disapproved the FDA's proposal. If a transmittal is shown but no regulation is put out for notice and comment, OMB is known to have disapproved the regulatory proposal.

The fact of forwarding is, in each instance, therefore, the functional equivalent of an intra-agency or inter-agency memorandum that states, "We recommend that a regulation on this [named] subject matter be promulgated." The fact of a failure to forward from the FDA to HHS, or from HHS to OMB is the equivalent of a memorandum from HHS to FDA that states, "We disapprove of your recommendation that a particular regulation on this [named] subject matter be promulgated." Such memoranda would seem protected by Ex-

emption 5, but the information sought from the Log discloses more. The Log will show the timing of the deliberative process and it will show the agency in which the deliberative process is at the moment going forward. The Log also shows, but plaintiffs do not seek, the offices and persons within HHS to which a proposal has been routed. Given plaintiffs' intimate knowledge of how regulation in these areas is conducted, however, the Log will disclose the office, and probably the persons, within the agency conducting the deliberative process at any given time. By the same token, the failure to forward will disclose, to those who follow the process as closely as plaintiffs do, the office or person responsible for rejecting a proposal to regulate.

The applicability of Exemption 5 to the material sought must be determined by considering the impact of disclosure upon the policies served by the exemption. Exemption 5 permits withholding of documents whose disclosure would harm the deliberative process of agencies. *Montrose Chem. Corp. v. Train*, 491 F.2d 63, 71 (D.C.Cir.1974); *accord Mead Data Cent., Inc. v. Department of the Air Force*, 566 F.2d 242, 256 (D.C.Cir.1977). It seems obvious that the disclosure required here will do just that.

The decisions in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), and *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854 (D.C. Cir.1980), show when recommendations are considered pre-decisional so that their disclosure would harm the deliberative process. These cases support, I would say

require, the application of Exemption 5 to the Regulations Log.

In *Sears, Roebuck* the documents sought were memoranda by the General Counsel of the NLRB explaining his decisions to file or not to file complaints and initiate litigation before the Board. The General Counsel's decisions not to file are final and unreviewable. The Court held that memoranda explaining decisions not to file complaints were "final opinions" made in the adjudication of a case and fell outside Exemption 5. "[I]t is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, *as long as* prior communications and *the ingredients of the decision-making process are not disclosed.*" 421 U.S. at 151, 95 S.Ct. at 1517 (emphasis added). By contrast, memoranda directing the filing of complaints were protected by Exemption 5 because, among other things, "the public's interest in disclosure is substantially reduced by the fact ... that the basis for the General Counsel's legal decision will come out in the course of litigation before the Board; and that the 'law' with respect to these cases will ultimately be made not by the General Counsel but by the Board or the courts." [1] *Id.* at 160, 95 S.Ct. at 1521. So it is in this case. The substance of the proposed regulation and the rationale underlying it will be made public when the proposal is published, comments are received, and the final regulation is promulgated. There is no reason whatever to force disclosure of information about pre-decisional recommendations. [2]

---

1. The Court said that, since the General Counsel's memoranda had "real operative effect—it permits litigation before the Board," Exemption 5 applied only because the General Counsel must become a litigant in the case about which he made his decision. This limiting factor has no relevance here because the fact of forwarding a proposal to regulate has no "real operative effect" any more than does a recommendation to regulate within the FDA, HHS, or OMB. As the Court held in *Grumman Aircraft*, Exemption 5 protects inter-agency recommendations as

much as it does intra-agency recommendations. 421 U.S. at 188, 95 S.Ct. at 1502.

2. There is no parallel between the NLRB General Counsel's explanation of refusals to file complaints and information about HHS's or OMB's disapproval of proposed regulations. The General Counsel's explanation in a process of adjudication is final and nonreviewable and hence becomes "secret law," which courts have held must be made known. FDA, HHS, or OMB decisions not to regulate or not to regulate in a particular way are not part of an adjudicatory

*Grumman* made the same distinction in holding that only Renegotiation Board decisions as to the existence of excess profits were final decisions and that reports from regional boards and divisions, being pre-decisional, were protected from disclosure by Exemption 5. In this case, only proposed and final rules, which do become public, are in any sense final decisions. The Regulations Log merely discloses information about pre-decisional recommendations.

It is impossible to see why the majority relies upon this court's decision in *Coastal States.* The court there applied the distinctions laid down in *Sears, Roebuck* and *Grumman* and stated that, in determining Exemption 5's application, courts ask "whether the document is 'predecisional'— whether it was generated *before* the adoption of an agency policy—and whether the document is 'deliberative'—whether it reflects the give-and-take of the consultative process." 617 F.2d at 866 (emphasis in original). The Regulations Log fits both of those criteria: it is clearly pre-decisional and it reflects, if it does not entirely disclose, the outcomes of the consultative process at each stage of that process. The *Coastal States* opinion stated, "We also ask whether the document is recommendatory in nature ... [,]" *id.,* and "a document from a subordinate to a superior official is more likely to be predecisional." *Id.* at 868. The proposals reflected in the Log are recommendatory in nature and are from subordinate units to superior units.

The plaintiff in *Coastal States* sought memoranda from regional counsel of the Department of Energy to auditors in field offices. The memoranda responded to requests for interpretations of regulations as they applied to real or hypothetical situations related to the audits of particular firms. The court explained the decision not to apply Exemption 5: "No 'decision' is being made or 'policy' being considered; rather the documents discuss *established*

policies and decisions—the agency regulations—in the light of a specific, and often hypothetical, fact pattern." 617 F.2d at 868. (emphasis in original). "[I]n fact, these opinions were routinely used by agency staff as guidance in conducting their audits, and were retained and referred to as precedent. If this occurs, the agency has promulgated a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label." *Id.* at 869. In contrast, the proposals shown by the Regulations Log are not used as guidance, in no sense constitute precedent, and are certainly not "secret law."

The majority mentions none of these crucial aspects of the reasoning of *Coastal States,* aspects which require the opposite result in today's case. The opinion's reliance upon *Coastal States* is highly selective. For example, the majority quotes the *Coastal States* court to show that the deliberative process privilege is meant to prevent the confusing dissemination of repudiated agency "reasons and rationales." Maj. op. at 1532 (quoting 617 F.2d at 866). The majority fails to quote the preceding clause of that same sentence, which sets out another of the privilege's "number of purposes"—"to protect against premature disclosure of proposed policies before they have been finally formulated or adopted." 617 F.2d at 866. The majority has simply decided to read the protection of agency recommendations out of the case law construing Exemption 5's deliberative process privilege. The truth is that nothing in *Coastal States*—and nothing anywhere else in the case law—supports the majority's narrowing of Exemption 5.

It is well to be clear about precisely what the majority has done. It has created a new law of Exemption 5 to the effect that, although the full text of pre-decisional recommendations may not be disclosed by judicial compulsion, some lesser amount of

process and are without precedential force or influence. Such refusals are prudential. Moreover, persons who think that regulations should be proposed can in effect obtain review of the decision by petitioning for rulemaking. 5 U.S.C. § 553(e) (1982). If the agency refuses to

initiate a rulemaking, the Administrative Procedure Act requires the agency to give its reasons. *Id.* § 555(e). The agency's decision not to regulate is then subject to judicial review. *See, e.g., American Horse Protection Ass'n v. Lyng,* 812 F.2d 1 (D.C.Cir.1987).

information about predecisional recommendations may be forced out of the agency. This is not merely unprecedented law, it is very bad law, and it is bad for more than one reason. The decision to regulate in a particular area often embodies a sensitive and important policy judgment, sometimes more sensitive and important than the later decisions concerning the precise extent and nature of the regulation. Decisions to require labeling of cigarettes or to regulate children's television programming come to mind as examples. We do not and cannot know that the FDA regulations entered in the Log are not often of this character. The majority's sweeping presumption that disclosure of a decision to extend regulation to a particular area is not indicative of any policy is entirely unsupportable.

That the Log's entries do not themselves recommend but merely memorialize recommendations no more strips the Log of protection than would a court sheet's memorializing a panel's tentative decision by stating "Reverse; I will write."[3] *See Mead Data Cent.*, 566 F.2d at 257 ("to exempt documents in which staff recommended certain action ... but require disclosure of documents which only 'report' what those recommendations ... are" is "to exalt form over substance").

Finally, the majority draws a line that will be impossible for courts to administer and that is certain to lead them to cut deeply into legitimate Exemption 5 protections. The decision that the recommendations the Log reveals are too "general" to deserve Exemption 5 protection requires courts to decide how much information about pre-decisional documents, short of the full document, may be disclosed without harm to the agency's deliberative process. This will involve courts in a continual

process of estimating or, more accurately, guessing about the adverse effect of the disclosure of a great variety of combinations of pieces of information upon the purposes of Exemption 5. These purposes include: protection of subordinates' willingness to provide decisionmakers with frank opinions and recommendations; prevention of the premature disclosure of proposed policies before they have been finally formulated or adopted; avoidance of the confusion of issues and the possibility of misleading the public by disseminating information suggesting courses of action that are not ultimately taken; and precluding the publication of reasons for actions which are not in fact the ultimate reasons for the agency's action. *See Coastal States*, 617 F.2d at 866. There is no way to avoid these very considerable harms, or to avoid a waste of judicial time and energy, if the majority's new rule becomes law. The purposes of Exemption 5 can be adequately served only if we hold that information concerning pre-decisional recommendations, as well as the full text of such recommendations, is protected from forced disclosure.

II.

I add some comments on the majority's responses to the government's particular arguments. The majority first rejects the argument that attribution of delay from disclosure of the Log will result in pressures on agency decisionmakers, producing precipitous decisionmaking. The majority presumes that since "many" individuals are involved in agency decisionmaking on any given topic, none will be affected by an attribution of delay to the agency. It is not apparent that "many" persons are involved in each decision to regulate, or that

---

**3.** The district court rejected any analogy to judicial decisionmaking since judges are not subject to the FOIA, 630 F.Supp. at 551 n. 1. That is a proposition not in dispute and utterly irrelevant. Courts are not subject to the FOIA for the same reasons that Exemption 5 takes agency deliberative processes out of the FOIA. That is why courts have long looked by analogy to the needs of their own decisionmaking processes to assess claims of privilege based on the needs of executive decisionmaking. *See, e.g., United States v.*

*Nixon,* 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) (President's expectation of "confidentiality in his conversations and correspondence" is "like the claim of confidentiality of judicial deliberations"); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 326 (D.D. C.1966); *see also United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941) (mental processes of administrator, like those of judge, may not be examined).

the presence of "many" will sufficiently dilute the blame to prevent ill effects on decisionmaking. Furthermore, as noted above, in many instances the identity of each of these persons will be obvious to plaintiffs and others familiar with the agency in question. The majority finally asserts that in any event "the public has a right to know the source of decisional delay." Maj. op. at 1531. Until now, I was unaware that the FOIA created such a right. The statute certainly says nothing about it, and reading such a right into the FOIA directly conflicts with the protection of the deliberative process provided by the FOIA's Exemption 5. "Decisional delay" is not a fact but an opinion; what plaintiffs or others may view as delay, by persons or offices that can be identified and publicly criticized, may be caused by unexpected complications or the difficulties of weighing competing values. Thus, the majority's new "right" will tend to produce precipitous decisionmaking and to discourage subordinates from providing their superiors with frank opinions about difficulties.

The majority responds to the government's second argument, that disclosure of the Log will inhibit disagreements with a proposal, by claiming that "specific views" of decisionmakers will not be deterred by disclosure of a "very general disposition" of an issue. As already discussed, the majority ignores the fact that this "general disposition" and the decisionmakers' "general" views to regulate at all are often crucially important pieces of information about pre-decisional recommendations.

The majority answers the government's concern that the Log's disclosure will greatly heighten agency lobbying by attempting to refute a straw-man. No one suggests that the deliberative process privilege should "isolate" agencies from "public opinion" or "silence public voices." Maj. op. at 1532. The privilege does nothing to aid or hinder "public opinion" or "public voices." Rather, everyone is at all times free to lobby agencies and indeed in due course will be invited to lobby by the agencies' notice and comment procedure. The privilege instead provides agencies a space within which they need not yet invite lobby-ing on their still-tentative reasonings and recommendations. But as the majority's argument implicitly acknowledges and plaintiffs in their pleadings explicitly admit, they seek access to the Log in part to issue themselves an invitation to engage in precisely this predecisional lobbying. Concern about the effect of lobbying on agencies may itself justify Exemption 5 protection. *See Chemical Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,* 600 F.Supp. 114 (D.D.C.1984) ("there is time enough for adversary testing" when scientific study is published by agency; *held,* Exemption 5 protects from disclosure); *see also Tax Reform Research Group v. IRS,* 419 F.Supp. 415, 423–24 (D.D.C.1976) (names of IRS employees withheld although content of opinions disclosed; *held,* Exemption 5 protects names from disclosure to avoid possible media harassment).

### III.

Since I find the Log protected by FOIA Exemption 5's deliberative process privilege, I would not reach the government's argument that a constitutional privilege protects Log entries revealing communications to and from the Office of Management and Budget. The argument was not raised below, and I am hesitant to address such a complex and important issue here in the first instance. But because the majority casually disposes of this serious issue I will briefly state my tentative views.

Although the constitutional defense to FOIA disclosure here asserted by the government is referred to as an "executive privilege," nothing about the privilege is distinctly executive. Rather, the privilege is an attribute of the duties delegated to each of the branches by the Constitution. Neither Congress nor the courts, any more than the executive, could be constitutionally forced by a coordinate branch to reveal deliberations for which confidentiality is required. *See supra* note 3. The constitutional privilege in question is, therefore, more accurately viewed as a government-wide privilege of confidentiality for deliberative processes. The privilege is, of course, not made effective merely because

it is invoked; particular circumstances and needs must always be considered. The issue here is whether, apart from Exemption 5, the reach of this privilege encompasses disclosure of the Log pursuant to the FOIA.

A starting point in considering this question is section 552(e) of the FOIA, which renders "the Executive Office of the President" an "agency" subject to the FOIA. 5 U.S.C. § 552(e) (1982). If a constitutional privilege exists that exceeds the limits of the FOIA's enumerated exemptions, this provision on its face would to that extent be unconstitutional, at least insofar as the President himself is not obviously distinct from the Executive Office of the President. *Compare* 5 U.S.C. § 551(1) (1982) (APA definition of "agency" silent on both President and his Executive Office) *with* 5 U.S.C. § 552(e) (FOIA definition of "agency" including Executive Office but silent on President himself); *see* 1 K. Davis, *Administrative Law Treatise* 8 (2d ed. 1978) (although on face of section 551(1) President "clearly" an APA agency, section 552(e) "clearly implies" that President not FOIA agency).

Congress in all likelihood recognized this difficulty, since it stated in the legislative history of amended section 552(e) that "Executive Office of the President" excludes " 'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President,' " *Rushforth v. Council of Economic Advisors*, 762 F.2d 1038, 1040 (D.C.Cir. 1985), *quoting* H.R.Rep. No. 1380, 93d Cong., 2d Sess. 14–15 (1974).

The government in this case of course does not and cannot argue that OMB is not an "agency" for FOIA purposes, since to advise and assist the President is not OMB's "sole function." *See Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C.Cir.1978) (OMB found to be FOIA "agency" due to its numerous statutory duties). Though I need not, and do not purport to, decide the question, it is arguable that, insofar as OMB does directly "advise and assist the President," communications to and from OMB in pursuance of this function may be

protected by the President's constitutional privilege, even if Exemption 5 of the FOIA did not exist. But since the issue was not addressed below, I do not believe that this court has a sufficiently developed record to characterize with confidence the role of OMB under Executive Order Nos. 12,291 and 12,498 at issue here. *See* 31 U.S.C. § 501 note (1982) (statutory functions of Bureau of the Budget vested in President, then delegated by him to OMB); *id.* §§ 1104, 1108 (agencies required to submit appropriations requests to President, whom statute requires prepare budget).

The majority apparently believes that the constitutional privilege is restricted to the President himself. Maj. op. at 1532. This is a troubling position because it ignores the President's need, both long-established and all the more imperative in the modern administrative state, to delegate his duties. *See, e.g., Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166, 2 L.Ed. 60 (1803); *Myers v. United States*, 272 U.S. 52, 117, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926); *see generally* Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch,* 84 Colum.L.Rev. 574, 660–61 (1984) (presidential intervention in agency proceedings "almost always" someone other than President acting in his name; "anticipated delegation" explains Constitution's references to "Departments"). If, as it appears, OMB's rulemaking oversight here at issue is a delegation either of powers vested personally in the President by statute, 31 U.S.C. §§ 501 & note, 1104, 1108 (1982), or of his powers under the Constitution itself, *see* art. II, § 2 (President may "require the Opinion, in writing, of the principal Officer in each of the executive Departments"), this delegation to be effective should carry with it the delegation of the President's constitutional privilege.

Contrary to the majority's view, applying the privilege to some functions of OMB would not invite its extension "to the entire Executive Branch." Maj. op. at 1533. The vast bulk of the executive branch, which receives its authority to act not simply by

delegation from the President but primarily by statutory delegation from Congress, would therefore be unable to invoke the President's privilege. *Compare Marbury v. Madison,* 5 U.S. (1 Cranch) at 166 (acts of "political or confidential agents" of executive who merely "execute the will of the President" are "only politically examinable" while those pursuant to a "specific duty ... assigned by law" and affecting "individual rights" are remediable by courts) *and Kendall v. United States,* 37 U.S. (12 Pet.) 524, 610, 9 L.Ed. 1181 (1838) (distinguishing executive officer's "duty and responsibility that grow out of and are subject to the control of the law" from those simply subject "to the direction of the President") *with Gravel v. United States,* 408 U.S. 606, 616–18, 92 S.Ct. 2614, 2622–23, 33 L.Ed.2d 583 (1972) (extending senator's speech-or-debate immunity to aide performing "a protected legislative act" but finding that such an act includes only some of senator's acts in official capacity).

I advance these thoughts not to assert that a constitutional privilege does apply here but only to warn that the majority's quick resolution of this question is altogether too simplistic.

In summary, the Regulations Log is properly protected from disclosure by the deliberative process privilege embodied in Exemption 5 of the FOIA. The majority fails to reach this result only by a mistaken and far-reaching reinterpretation of that exemption. Accordingly,

*I dissent.*